## Wheeling.

JACOB HEAVENER *et al. vs.* JOHN GODFREY AND WIFE.

January Term, 1869.

In 1835, M gave his two daughters, Jane and Margaret, the remnant of 1,000 acres of land, amounting to 300 or 400 acres. Margaret desired her portion in something else and disposed of her undivided moiety to J., her brother. Jane married and she and her husband take possession of one end of the tract. J. obtains title to Margaret's undivided moiety, and by agreement, in 1838, a division line is run partitioning the land between the parties in interest, to which Jane, then married to G., never fully gave her consent, although she stood by and seemingly acquiesced in a sale of J.'s portion to B. & H., in 1843, who took possession and cleared up to the partition line. Afterwards, in 1851, Jane and her husband brought suit for a partition and obtained a decree, assigning to them parts of the land sold by J. to B. & H. HELD:

> That the court below should have dismissed the bill, but without prejudice to the rights of Jane or her heirs, as she and her heirs are not bound by the fraudulent acts of her husband, G., nor has she in any other way lost or surrendered her right to a fair and equitable partition of the land in question.

On the 24th of June, 1851, John Godfrey, and Jane, his wife, filed their bill in the circuit court of Lewis county, against Richard Bond, Amos Heavener, and others heirs of John Mitchel, Sr., deceased, and the cause was procceeded in, in the circuit court of Lewis county until September, 1855, when it was transferred to and docketed in the circuit court of Upshur county. On the 14th of August, 1835, John Mitchel, Sr., and father of complainant, Jane Godfrey, executed a paper, covenanting to make his right to one moiety of a remnant of a certain tract of land in Lewis county, known as the "Hannerman tract," the other moiety having been contracted to Margaret Mitchel, another daughter of John Mitchel, Sr. John Mitchel, Jr., a son of John Mitchel, Sr., became the owner of the land contracted to the said Margaret Mitchel. About the year 1838, John

Mitchel, Jr., and John Godfrey, and Jane Godfrey, his wife, agreed to make partition of the land, and accordingly a certain M. G. Bush made the partition by running and establishing the line between them. Godfrey and wife took possession of their end of the tract. In March, 1838, Richard Bond purchased a part of the remnant so owned and held by John Mitchel, Jr., and in May, 1843, John Mitchel, Jr., conveyed the same to him. Subsequent to the year 1838, and prior to April, 1843, Jacob Heavener purchased the residue of the part of said remnant, and on the 26th of April, 1843, John Mitchel, Jr., conveyed the same to him. In June, 1851, John Godfrey and wife instituted suit in the circuit court of Lewis county, against the heirs at law of John Mitchel, Sr., for a repartition of said remnant of said tract, in which a decree was pronounced, repartitioning said land and assigning a small part of the land conveyed to Richard Bond to Godfrey and wife, and a considerable and valuable part of the land conveyed to Jacob Heavener. The complainants in the bill for partition denied any agreement with John Mitchel, Jr., for the partition of said land made by Bush, or that they ever acquiesced in the same, or that the same was a full partition of the land between them. Bond and Heavener, who were made defendants in the suit, answered the bill separately, setting up said agreement, partition, and acquiescence on the part of Godfrey and wife, and that said Godfrey and wife were cognizant of the purchases made by them of John Mitchel, Jr., of the land so surveyed and partioned by Bush between said Mitchel and Godfrey and wife. Depositions were taken in the cause by both complainants and defendants. On the part of the complainants in the court below, Michael G. Bush testified that he ran the division line that had been agreed on between John Godfrey and wife and John Mitchel. Witness was called on to run said line by John Godfrey and John Mitchel, but Jane Godfrey refused to have it run at that time or to have it run as agreed upon between her husband and John Mitchel. Aftewards, witness was called on and they said they had agreed upon a

line satisfactory to all parties. John Godfrey and John Mitchel were with witness when he ran the agreed line. Jane came on to the ground and asked him where he had begun. Witness showed her and she said it was right. She went a short distance showing witness where the line had been agreed on, and it was run accordingly. John Godfrey paid half his fees and John Mitchel the other half, and all parties seemed satisfied with the equality of the partition. He then believed the partition was a fair one. It was also proven by David Wilson, that in a conversation with Jane Godfrey, in March or February, 1851, in relation to the division of the land, she stated that the land was in the first place divided or set apart, by John Mitchel, her father, for herself and sister Margaret, and that Margaret wishing to have her portion in something else, desired her father to take back the land; that he did so; and afterwards sold the land designed for Margaret to John Mitchel; that John Mitchel and she (Jane) settled on and agreed to a division line, that she was now dissatisfied with the agreed line, and meant to have a division made according to law; that the line agreed upon between her and John Mitchel was run by M. G. Bush, and that the agreement was witnessed by a written article, but that she did not know where it was. There was other evidence showing that all the parties were satisfied at the time, with the division line made by Bush, and also showing the relative value of the respective portions of the land, and that the purchases of Bond and Heavener were notorious in the neighborhood when made, and that about the time John Mitchel was selling to Heavener, and after he had sold to Bond, Mitchel was pressing Godfrey to sign the contract of division, which Godfrey refused to do, saying he never would sign it or agree to it. From the decree of the circuit court of Upshur, confirming the action of the commissioners in the partition of said land, Bond and Heavener obtained an appeal to this court.

*Edmiston* for the appellants.
*Henry Brannon* for the appellees.

BERKSHIRE, J.    John Mitchell, of Lewis county, in his life time owned a tract of land in that county, containing 1,000 acres, which was conveyed to him by Hanway and Anderson.

Prior to August, 1835, he had sold and conveyed all of said tract except about 269 acres, 240 of the 1,000 acres having been conveyed to his son, John Mitchel, Jr.

On the 14th of August, 1835, John Mitchel, the father, executed a paper in the nature of a title bond whereby he bound himself to make his right to one undivided half of the residue of the 1,000 acres to his daughter, Jane God- frey and her heirs, and the other half was to belong to his daughter, Margaret Mitchel.   Mrs. Godfrey and her hus- band John Godfrey, had taken possession of the eastern end of the 269 acres some time before this, and .built a house and made some improvements under, as she claims, a ver- bal promise of her father to sell her the one- half of the said residue or remnant of the 1,000 acre tract.

Margaret Mitchel, it appears, became dissatisfied with the arrangement thus made for her, and her father afterwards took the land back and sold it to his son, John Mitchel, and made .other provisions for Margaret.   John Mitchel, the father, afterwards departed this life, leaving numerous chil- dren and grand-children, a portion of whom afterwards conveyed to the said John Mitchel, Jr., the land so pur- chased of his father in his life time.

Some time in the year 1838, probably in March, a parti- tion of the residue of the 1,000 acres was made between John Mitchel, Jr., and Jane and John Godfrey, and each of the parties took and held their respective parts thereafter in severalty according to the division line made at the time.

On the 19th of March, 1838, John Mitchel, Jr., sold by metes and bounds, a portion of the part that fell to him in the partition to one John Bond up to and adjoining on part of the division line, and afterwards conveyed the same to him by deed bearing date on the 2nd day of May, 1843.    And on the 26th of April, 1843, he conveyed the residue of his part to one Jacob Heavener.

The said Bond and Heavener each took possession and held and improved their respective parts up to said division line, without molestation or hindrance, until June, 1851, when this suit was instituted by Jane and John Godfrey in the circuit court of Lewis county for partition of the land in controversy between the complainants and the said Bond and Heavener, or his son who claimed under him.

The bill alleges that John Mitchel, the father, in his life time, having told the complainant, Jane Godfrey, (then a widow with three children), that he would sell her the one half of the residue of the 1,000 acre tract, which they allege contained 300 or 400 acres, she, upon the faith of this promise, moved and settled on the eastern end of it, and built a house and made some improvements, and afterwards intermarried with the said John Godfrey; and that after this the title bond of her father, John Mitchel, was executed binding him to make her title to one-half of the residue of the 1,000 acres, and giving her sister, Margaret Mitchel, the other half.

The bill charges that John Mitchel, Jr., after the death of his father and after the complainants had been in possession, for some time, *without their knowledge*, procured one Michael G. Bush, a surveyor, to run a division line between them, giving to them not more than 50 or 60 acres of not more than equal value, exclusive of improvements, with the residue of said tract, and that they strenuously protested against the inequality of the partition at the time it was made and ever since. That both Bond and Heavener had notice when they purchased, that the land was undivided, also that they notified Bond when he was making his improvements that he was trespassing on their rights and they intended to bring suit, &c.

The said Bond and Heavener filed their separate answers to this bill, in which they each deny that they had notice or knowledge at the time they respectively purchased, that the land was undivided, but on the contrary they each aver that the division was not made at the instance of John Mitchel, Jr., alone, but that it was made by the complainants and

said Mitchel by mutual consent, and that they were each induced to purchase on the faith of this partition. And the said Bond avers that he made his purchase on the same day the division was made, and that the said Bush witnessed the title bond executed to him by John Mitchel, Jr.; and the said Heavener also avers that at the time he purchased his part he saw the division line and corners well marked, and believes John Godfrey was along at the time, and it was well known and notorious that said partition had been made by the parties; and his vendor, John Mitchel, had deadened the timber up to the division line before his purchase. That the complainants well knew of his negotiations for his purchase of, and payment for, his part of the land, but never, so far as he knew, made any objection or complaint about the division, or attempted to molest him in his possession of the land until this suit was instituted. That at one time after he had purchased he talked to complainants about the purchase of their land. That John Godfrey was very anxious to sell at the time and claimed that their part was very valuable and pointed out its many advantages, &c. But Mrs. Godfrey, as well as her son-in-law, who claimed an ultimate interest in it as heir, was opposed to the sale. That his vendor, John Mitchel, had removed to the west and was reputed to be insolvent, and he claims that as the complainants knew of his purchase and payment of his money, on the faith of said partition, and never made known to him that they were dissatisfied with the partition made or had any claim to the part purchased by him, they ought not now to be allowed to disturb him in his possession. And the defendant Bond in like manner claims that he purchased in the utmost good faith upon the belief that the partition was fairly and honestly made, and entirely satisfactory to both parties at the time of his purchase and payment of his purchase money. He denies that complainants, or either of them, ever notified him that he was trespassing on their rights, and that they intended to bring suit, &c.; but says that at the time he was inclosing his part Mrs. Godfrey came along and told him he was put-

ting the fence slightly over on her side of the division line, and he thereupon set the fence to suit her pretensions and according to the corner and line as she claimed it, and avers that she expressed no dissatisfaction with the division line to him then or at any other time until at or about the time of the bringing of the suit.   He also denies that he knew the partition was unequal, as alleged in the bill, but believes that considering the quality of the land the division was made equal.    That he improved the land and deadened the timber up to or near the division line soon after his purchase, and made valuable improvements, and paid his purchase money with the full knowledge of the complainants; and insists that he ought not now be disturbed in his possessions and rights by these complainants, who with a full knowledge of all these facts stood by and induced him to believe that all was right; and especially so as his vendor has removed to the west and is reported to be insolvent.

Numerous depositions were taken on the question of the inequality of the division made by the complainants and John Mitchel, Jr., and the acquiescences of the complainants in said partition.

The testimony as to the equality of the partition so made is conflicting, but preponderates in favor of the complainants.

The court upon the hearing rendered a decree for partition and appointed commissioners for the purpose, who proceeded to make another partition and reported that the former partition was unequal, and they accordingly gave to the complainants $35\frac{3}{4}$ acres more land, making their share $102\frac{1}{4}$ acres, instead of $66\frac{1}{4}$ as in the former partition, a part of the $35\frac{3}{4}$ acres being taken off the Bond part and the residue off of the defendant Heavener's part.

The report of the commissioners was confirmed by the final decree in the cause, which is the error complained of here.

It is insisted by the appellants that, under the facts and circumstances of this case, they ought not now to be disturbed in their possessions, whether the partition made by

the complainants and John Mitchel, the appellant's vendor, was equal or not.

That the complainants, with a full knowledge of their own rights in the premises and of the respective purchases of the appellants and the payment of their purchase money and the making of improvements on the land, stood by and failed to make known to the appellants, or either of them, their alleged rights and claim to the land so purchased, or to express any dissatisfaction with the partition so made between them and John Mitchel, Jr., and that by their concealment of their right, if any they had, and their acquiescence in the purchase of the appellants the complainants are estopped and ought not to be permitted in a court of equity to assert any right or title to the land in controversy, as to the appellees.

No principle of equity seems to be better established, or is more readily applied in a court of equity, than that if a person knowing his own rights stands by and encourages or permits an innocent party to purchase his property or to make valuable improvements upon it without making known to such purchaser his rights in the property, is estopped thereafter from asserting any claim to it.   1 Story's Equity Jurisprudence, sections 384, 385, and authorities cited; 2 T. C., 422; 1 Fonbl., 151, 152.

Do the facts and circumstances of this case bring the appellees, or either of them, within the scope and inference of this doctrine?

Although denied by them in the bill it is made abundantly clear by the testimony in the cause, that the complainants both had knowledge of, participated in, and agreed to the partition made by them and John Mitchel, Jr., and that all parties were satisfied with it at the time it was made.   Michael G. Bush, the surveyor who run the division line and whose evidence is in the record, says that he was called on by John Mitchel, Jr., and John Godfrey, to come and run the division line between said Mitchel and John and Jane Godfrey.   That he went accordingly, but when he got there Mrs. Godfrey was not agreed to the line

agreed on by her husband and John Mitchel, and that he left without running the line at the time. That he was again called on in a short time thereafter, understanding that they had then agreed on a line that was satisfactory to all parties. That he went to John Godfrey's and Mitchel took him and showed him the corner which was marked and agreed on by the parties as the corner of the division line, and commenced running, and after he had run some distance Mrs. Godfrey came out and inquired where he had commenced, and after showing her the beginning corner she said it was right and went on with them some distance and showed and told him how and where it was agreed on between her and her husband and John Mitchel the division between them should be, and run it accordingly. That he thought the division was a fair one, and if he had been going to make a choice between them he would not have known which part to take. That the hill land was not considered valuable at that time, and that all parties seemed well satisfied, and John Godfrey paid one-half of the fees and John Mitchel the other.

John E. Mitchel, a nephew of Jane Godfrey and John Mitchel, Jr., says he was present when said Bush was preparing a writing for the complainants and John Mitchel, Jr., to sign in reference to this partition, and Bush asked the parties if they were satisfied with the division and they all replied that they were. That he lived within a half mile of complainants and of the land purchased by Bond and Heavener, and that they each took and held possession of the land from the time of their respective purchases. That their purchases were notorious and a general neighborhood talk from the time they were made, and that he never heard any dissatisfaction expressed by complainants in relation to the purchase of said land by the said Bond and Heavener.

It is also proven by other witnesses that both Bond and Heavener took and held possession of their respective parts, and soon after their purchases deadened the timber up or quite up to the division line, and continued to im-

prove and hold up to said line without interruption until the institution of this suit.    It is also proved that Mrs. Godfrey on one occasion stated that said Bush had run the division line between them and that the agreement as to the partition was witnessed by a written article, but that she did not know where it then was.

Other witnesses also proved that they were well acquainted with the complainants; were frequently with them, but never heard either of them express any dissatisfaction with the division of the land or with the purchases of the land by Bond and Heavener.    And it is also proved that John Godfrey was present at the time of Heavener's purchase and made no objection to the same.

There is no evidence in the record showing that the complainants, or either of them, ever made any objection or expressed any dissatisfaction to either Bond or Heavener with the partition made between them and John Mitchel, Jr., or of the purchase of the land by Bond and Heavener.

But it does appear from the evidence that on several occasions they expressed themselves to others as being dissatisfied with said division on account, as they claimed, of its being unequal.

From all that is disclosed in this record, therefore, I feel compelled to the conclusion that the complainants, and each of them, must be considered as occupying the position of a party, who, being aware of his own rights, yet stands by and allows his property to be purchased, paid for and improved by an innocent purchaser, without making known to such purchaser his rights and claim to the property.

And according to the principle of equity before adverted to, the conduct of the appellees in the premises amounts to a constructive or legal fraud, at least on the rights of the appellants to the land thus clearly acquired by the laches of the complainants.

The next inquiry is, are they both involved and brought within the influence of the doctrine applicable to such cases,

or is the female appellee by reason of her overture shielded from the consequences of her own acts ?   Justice Story, in his Equity Jurisprudence, vol. 1, sec. 385, after reviewing and discussing the doctrine of constructive frauds in cases of this kind says, "Indeed cases of this sort are viewed with so much disfavor by courts of equity that neither infancy nor coverture will constitute any excuse for the party guilty of the concealment or misrepresentation, for neither infants nor *femes coverts* are privileged to practice deceptions or cheats on innocent persons."     Numerous authentic authorities are cited by him in support of this doctrine.   Judge Tucker also lays down the same doctrine, 2 T. C., 422.   See also 1 Fonbl., 163, nearly accordant, and cases there cited.

This then being the governing principle in cases of this kind, the facts and circumstances of the present case, as it seems to me, make it a strong one for the application of the doctrine; and I can see no equitable ground upon which after the lapse of more than twelve years' acquiesence on the part of the appellees, they can claim exemption from the general rule in like cases. From the foregoing views, therefore, I am compelled to the conclusion that the bill in this case should have been dismissed, instead of the decree that was rendered for partition.

But if I am in error in this view there is still another objection urged against the decree complained of.   It is insisted here that the original partition was at least binding as to the appellee, John Godfrey, who is still living and entitled in right of his wife to the control of the land in controversy.

It seems too well settled that in a case of voluntary partition of the wife's land by the husband and wife and another tenant in common, *parcener,* or joint tenant, the husband who is *sui juris* will be bound even in a case where the wife is not, and that he will so be bound during coverture, or if he be tenant by the curtesey during his life ; and that a bill filed for partition by him and wife during such coverture or life, as the case may be, should be dismissed.

I, therefore, think the decree should be reversed and the bill dismissed.

Judges Brown and Maxwell concurred in reversing the decree and dismissing the bill, but without prejudice to the rights of Mrs. Godfrey or her heirs, as they were of the opinion that she was not bound by the fraudulent acts of her husband, nor had she in any other way lost or surrendered her right to a fair and equitable partition of the land in question.

DECREE REVERSED.