# CHARLESTON.

McNEELEY v. SOUTH PENN OIL COMPANY, *et als.*

Submitted September 6, 1902. Decided March 28, 1903.

1. HUSBAND AND WIFE—*Children—Limitations.*

> Husband and wife being seised as joint tenants of land, her interest being separate estate, the husband alone, during coverture, sells the whole tract by executory contract, and the purchaser goes into possession during coverture, and later the wife dies, leaving the husband and children surviving her, and later the husband conveys the whole tract to the purchaser by deed. The possession of the purchaser is not adverse to the wife in her lifetime and right of entry or action does not accrue

to her children until the husband's death, and the statute of limitations begins to run against them first at his death. (p. 620).

2. ESTATE—*Survivorship.*

Survivorship in estates by entirety was abolished 1st July, 1850, by section 18, chapter 116, Virginia Code 1849, continued in the West Virginia Code of 1868, chapter 71, section 18. (p. 622).

3. CURTESY—*Estate.*

Curtesy in a wife's separate estate vests in her husband first upon her death. (p. 622).

4. HUSBAND AND WIFE—*Adverse Possession—Hostile Title.*

Quaere. Where man and wife are jointly seised of land, her interest being separate, and adverse possession under a distinct hostile title begins during the coverture; but before the period fixed as a bar by the statute of limitations has run out, the wife dies leaving children and husband surviving her. Does the statute stop running as to the heirs until the close of the curtesy by the death of the husband? Does his failure to sue affect them? Is there a second or separate right of entry or action accruing to the heirs at the husband's death? How, when the husband during coverture has conveyed to the occupant, by deed purporting to pass in fee the whole tract? Does the statute run against the heirs before the husband's death? (p. 624).

5. HUSBAND AND WIFE—*Conveyance—Survivorship—Coverture.*

The conveyance of land to husband and wife since 1st April, 1869, does not create an estate by entirety, but a joint tenancy, and the wife's interest is separate estate. The joint effect of section 18, chapter 71, abolishing survivorship in estates by entirety, and of chapter 66, relating to separate estate of married women, of Code of 1868, is to abolish estates by entirety. The husband is not entitled to sole possession during coverture, but has curtesy in his wife's half after her death. (p. 628).

6. PURCHASER—*Executory Contract—Joint Tenancy.*

Possession by a purchaser under an executory contract of sale made by the husband alone, of land owned in joint tenancy by husband and wife is not adverse to the wife. (p. 629).

7. HUSBAND AND WIFE—*Executory Contract—Coverture—Limitation.*

When a husband by executory contract during coverture sells land owned by him and his wife as joint tenants, and the purchaser takes possession, and then the wife dies, and then the husband conveys to the purchaser the whole tract by deed, the possession is not adverse to the heirs of the wife until the hus-

band's death, as until then they have no right of entry or action, and the statute of limitations does not run against them until then.   (p. 629).

8.   EXECUTORY CONTRACT—*Land—Limitations.*

An executory contract for the sale of land, stipulating for the future conveyance of legal title, the purchase money payable in future, is color of title under the statute of limitations as to hostile claimants.   (p. 631).

9.   LIMITATIONS—*Oil Lease.*

Chapter 61, Acts of 1872-73, fixing three years as the limitation for suits to recover lands leased for oil or minerals, was repealed by chapter 102, Acts 1882, re-enacting chapter 104 of the Code.   (p. 633.)

9.   CONSTRUCTIVE POSSESSION—*Trespass.*

There can be no constructive actual adverse possession of land by reason of possession of part of the occupant's land where there has been no actual possession of some part of the land of another person which he might treat as a trespass and sue for. (p. 636).

10.   LAND—*Owners—Possession.*

Where an occupant's boundary covers adjoining lands of separate owners, his possession on land of one of them will not be adverse possession of land of the other, without actual possession of such other's land, on the theory that possession of part is possession of the whole.   (p. 637).

11.   LIMITATIONS.

Chapter 61, Acts of 1872-73, fixing three years' limitation for suits to recover land leased for oil or other mineral, was repealed by chapter 102, Acts 1882, re-enacting chapter 104 of the Code.   (p. 639)

12.   STATUTE—*Constitution.*

The said chapter 61, Acts 1872-73, is unconstitutional and void, because of failure in its title to express the object of the act.   (p. 641).

13.   MARRIED WOMAN—*Estopple—Conveyance.*

A married woman will not, by reason of estoppel *in pais* lose her right to land owned jointly by her and her husband simply by knowledge that her husband is negotiating an exchange of the whole land in his name, or has exchanged it as his sole land, or by expressing casually satisfaction with the exchange after it has been made.   Silence does not bar her right.   Nor will her heirs be so barred by mere silence, though they know of improvements put upon the land by or under the other party to the exchange.   (p. 643).

Appeal and *supersedeas* from the Circuit Court, Wetzel County.

Action by C. B. McNeeley *et als.*, against the South Penn Oil Company. Judgment for defendants and plaintiffs appeal.

*Reversed and Remanded.*

THOS. P. JACOBS, EDWARD A. BRANNON and THOS. P. HORNER, for appellants.

ERSKIN & ALLISON, FLEMING & FLEMING, W. S. HAYMOND, W. N. ARNETT, JR., ARNOLD, MORTON & IRWINE, for appellees.

(a.) By deed 4th April, 1873, Edgell conveyed to Nathan Higgins and Mary Higgins, his wife, a tract of one hundred acres of land. By a written agreement, 23rd September, 1873, between Nathan Higgins and John W. Starkey they exchanged lands, Higgins agreeing to convey to Starkey said tract of one hundred acres, and Starkey agreeing to convey to Higgins a tract of fifty acres. Mary Higgins was not a party to this agreement. She died 12th February, 1875, and her husband in April, 1898. The agreement recited that the land was the Allen Edgell farm. It provided that Starkey should pay Higgins one hundred and twenty-five dollars boot, payable in future by installments. By deed 26th July, 1875, Nathan Higgins conveyed to Starky the one hundred acres, reserving a lien for unpaid purchase money. The agreement provided for immediate delivery of possession of the two tracts under the exchange, and a son of Nathan Higgins living on the one hundred acres moved from it and another son moved on the fifty acres and Starkey moved from the fifty acres and took actual possession of the one hundred acres 3rd October, 1873. The deed from Higgins to Starkey referred to date and record of the deed from Edgell to Starkey and wife.

(b.) By certain conveyances the Corning Oil Company and others derivatively from Starkey became lessees of twenty-six acres of the one hundred acres under a lease for oil and gas purposes, and the South Penn Oil Company became lessee of the residue seventy-four acres, about 11th February, 1897, the Corning Oil Company and others jointly owning with it the

lease of the twenty-six acres went into possession and bored several producing oil wells on the twenty-six acres. On the 21st August, 1895, the South Penn Oil Company under its lease of the seventy-four acres took actual possession and bored several producing wells. G. B. McNeeley and others having acquired the interests of certain children and heirs of Mary Higgins, together with certain other heirs, in January, 1899, filed a bill in chancery against the South Penn Oil Company and others calling for an account of all oil taken from said land and payment to the plaintiff for it.

(c.) The case resulted in a decree dismissing the bill, from which decree the plaintiff took an appeal.

BRANNON, JUDGE:

A vital question in this case arises on the statute of limitations. Is the right of the plaintiffs to that half of the tract of one hundred acres vested in Mary Higgins lost to them by reason of the statute of limitations? The defendant oil companies say that when Starkey, under the executory contract of exchange between him and Nathan Higgins, took actual possession of the one hundred acres in October, 1873, the statute at once began to run and had run the limitation period of ten years long before the commencement of this suit. That depends upon the question whether that possession was adversary to Mary Higgins. Counsel for plaintiffs say that it was not adversary, for the reason, first, that the conveyance to Nathan and Mary Higgins created, not a joint tenancy, but an estate by entirety, and that he could not sell either his own or his wife's estate in the land, and his contract of sale would constitute no color of title, but was nugatory for all purposes, and besides that Nathan had right to the control, possession and rents and profits of his wife's share, in short, a life estate therein, just as by common law, a husband had a life estate in the sole land of a wife, and under settled principles the statute would not begin against her or her heirs until the death of the husband.

The defense says that the conveyance of the land did not create an estate by entirety, but simply a joint tenancy, by the law ruling at the date of such conveyance. By common law

land conveyed simply to a husband and wife did not, as in the
case of a conveyance to two persons, not husband and wife,
creates a joint tenancy, but an estate by entirety. "It is a *sole,*
not a *joint* tenancy. Each holds the *entirety.* They are *one* in
law, and their estate *one and indivisable.*

If the husband alien, if he· suffer a recovery, if he be at-
tainted, none of these will effect 'the right of the wife, if she
survive him.

Nor is this by the *jus accrescendi.* There is no such thing
between them. That takes place where, by the death of one
joint¹ tenant, the survivor receives an accession, something
which he had not before, the right of the deceased. But hus-
band and wife have the *whole,* from the moment of the convey-
ance to them, and the death of either cannot give the survivor
more." This statement of the nature of this ancient estate
in land, dating far back in time, in *Thornton* v.· *Thornton, 3*
Rand. 179, is supported by all the authorities.

No partition, voluntary or involuntary, can be made be-
tween husband and wife of such an estate. 11 Am. & Eng.
Ency. Law 49; 2 Minor 471. One dying, the survivor gets
the whole. In such land the husband had, at least, an estate
for his life, and if he outlived his wife, he simply retained the
whole. His conveyance of the whole would operate to confer
on his grantee an estate during his life, and if he survived, it
would pass the fee to the whole. 1 Washb. R. Prop., sec. 913;
Bl. Com. book 2, 182; *Gray* v. *Bailey, 23* S. E. 318.

If Nathan and Mary Higgins did take an estate in entirety,
and she had outlived him, on. common law principles the
statute would not count against her in favor of Starkey until
his death, because until then Nathan's marital right of posses-
sion would not expire; until then she could not recover of
Starkey either her own or his interest; but as she died first,
there could not be by common law any question of the statute,
as his contract with Starkey would, upon her death, confer
right of possession upon Starkey. But this could not be the
case, because at the date of the contract the statute found in
Code, section 18, chapter 71, was in force providing that "if
hereafter an estate of inheritance be conveyed or devised to a
husband and his wife, one moiety of such estate shall, on the

death of either, descend to him or her heirs, subject to debts, curtesy or dower as the case may be." This enactment has been in force since the Virginia Code of 1849 took effect, 1st July, 1850, and therefore Nathan and Mary Higgins took subject to it, and Nathan could not take the fee upon his wife's death, as he would have done by common law, and his exchange with Starkey did not confer a fee in his wife's moiety upon her death, as the fee in reversion went to her heirs. But the statute says that he shall have curtesy in his wife's moiety, and it is settled that the heirs would not be subject to the statute until the close of the curtesy estate by the death of Nathan Higgins, the life tenant by curtesy. *Arnold* v. *Bunnel,* 42 W. Va. 473; *Merriit* v. *Hughes,* 36 *Id.* 356; *Austin* v. *Brown,* 37 *Id.* 634. But here a question of nicety arises, on which but one case has been cited, and on which I have been able to find but little authority. Say that as the right of Mary Higgins was separate estate, the statute began to run against her in her life-time. *Randolph* v. *Casey,* 43 W. Va. 289. If it had run out during her life, she would have been barred, and her heirs would have been barred, as they derived only from her, and if her right had been lost and passed by the statute, so would theirs have been. But the statute had not barred her right before her death. All authority does say that if the statute begins to run against an ancestor, it goes on against his heirs even though infants. *Talbott* v. *Woodford,* 48 W. Va. 449. That is because they can sue. How is it where the husband has made a deed conveying all his right to a third party carrying with it his curtesy, which curtesy in her separate estate first vests at her death? *Guernsey* v. *Lazear,* 51 W. Va. 328; 15 Am. & Eng. Ency. Law, 819. Does that rule apply then, or does the statute stop until the close of the curtesy? It is an axiom of the law of statutes of limitations that to apply them to bar title to land there must be a right of entry. Citations in *Merritt* v. *Hughes,* 36 W. Va. p. 362. Nobody can maintain ejectment unless he have a right of entry. *Adkins* v. *Spurlock,* 46 W. Va. 139; Code, section 4, chapter 90. From the last breath of Mary Higgins to the last breath of Nathan Higgins there was no right of entry in her children. They could maintain no suit to recover possession from Starkey. How, then,

can the period of duration of the curtesy estate be counted against her children?. Bar a right when there is no right of suit for it!. Counsel for the Corning Oil Company, seeing this trouble, argues that the children could have maintained a suit in equity to remove cloud from title, and cite *Austin* v. *Brown,* 37 W. Va. 634. I do not see that they could do so, as they were not in possession. *Moore* v. *McNutt,* and *Christian* v. *Vance,* 41 W. Va. 695, 754. Austin Brown does not say that one who is neither in, nor entitled to possession can maintain such a bill. It cannot be· cited to uphold the proposition that the Higgins heirs could sustain a chancery suit to impeach Starkey's right to the curtesy estate or to get possession while it existed. If they could have maintained a suit for an injunction against extraction of oil, or for an account of oil taken from the land, that would not give possession. They could have no partition during the curtesy. *Merritt* v. *Hughes,* 36 W. Va. 356. To bar their legal title you must prove that when the right vested by descent in them they could maintain ejectment to vindicate their title and admit. them to full actual possession. They held legal title, but only as reversioners, and that title had no force to give them possession in a law or equity forum during the life of Nathan Higgins. We are talking of full common law remedy giving full possession. It cannot be unqualifiedly asserted that when once the statute starts it · stops for no after *event.* If a statute suspends its operation, it stops for the period of suspension because of the mandate of the law. 1 Cyc. 1023; 1 Rob. Prac. 624. Now, when the law creates an estate by curtesy, operating to suspend entry and action, why should not the statute of limitation stop? More so because infants can sue; but a reversioner or a remainderman cannot. The law commands it to cease running in consideration that it tolls for a time the right of entry. We are told of that rule that disabilities arising after the start of the statute do not stop its currency; but the vesting of the estate by curtesy is not a disability.

This argument was made in *Jackson* v. *Johnson,* 5 Cowen 74, (15 Am. Dec. 434, 447). There were two disabilities, infancy and coverture, when adverse occupation began, and they were both removed by death; but then curtesy began, and it

was held that the curtesy suspended the statute, and that the intervention of a particular estate was not a disability; that is, it could not be pleaded like a supervenient disability arising after the accrual of cause of action; in short, that the intervention of the curtesy operated a suspension of the statute; that in fact the land did not descend during curtesy so as to give right of entry. The opposite has been held in *Beattie* v. *Stewart,* 154 Ill. 273. The decision there was that when adverse possession begins in the wife's life her death does not suspend it, notwithstanding the husband's curtesy. There being no right of entry, I consider the New York case the more logical.

In our case the husband sold and later conveyed his curtesy to Starkey, and Starkey had right, as against the children of Mary Higgins, to occupy the whole land during curtesy. The possession of a life tenant is not adverse to the remainderman, as the life and the remainder estates are consistent, not adverse. *Austin* v. *Brown,* 37 W. Va. 634, and authorities p. 362, of 36 W. Va. in *Merritt* v. *Hughes;* 1 Cyc. 1056. But as Starkey purchased in fee and was expressly a life tenant, I will treat the possession as adverse, for argument's sake, and make the intervention of the tenancy by curtesy beginning with the death of Mary Higgins as working a suspension of the statute. Or may we not say that there were two rights of entry, one to Mary Higgins, the other to her children at her death? As the coming of the life estate ended her right of entry, a new and distinct right of entry first arose upon the death of Starkey in favor of her children. Jᴜᴅɢᴇ Hoʟᴛ in *Austin* v. *Brown,* 37 W. Va. p. 369, using the words of *Stevens* v. *Winship,* 1 Pick. 318, said: "A remainderman is not obliged to enter for a forfeiture by tenant for life, and a new right of entry accrues to him at the death of the tenant for life." In *Tilson* v. *Thompson,* 10 Pick. 359, it is held that "A reversioner is not obliged to enter during the life of the tenant for life for a disseisin of such tenant or a forfeiture for waste, but a new right of entry accrues to him at the death of such tenant."

Tyler on Eject. 117. If such is the law, no right of entry was born to these heirs until the death of Nathan Higgins.

If the ouster occurs during the curtesy after the wife's death, who would deny that the statute only runs from the

death of the tenant by curtesy?. What in reason differentiates the case where the ouster was in the wife's life?.

I have been considering the case, not of an occupant under distinct adverse title, hostile to both husband's and wife's rights, but of one who has the conveyance from the husband passing his curtesy. In the former case it may be well said that the statute having begun to run in the wife's life-time keeps on against her heirs. It does surely, if she leaves no hus-band; but if she leaves a husband entitled to curtesy, and he does not sue the intruder for himself to vindicate his curtesy and the reversion, does the statute go on while the curtesy lasts and bar the heirs even in the case of possession under such dis-tinct title? Only the husband can sue while he lives. It seems hard that his default should detriment the heirs after his death. The law protects the heirs from the statute.

"The right of entry in the person entitled in remainder can in no case be affected by the statute during the existance of the particular estate, and the *laches* of a tenant for life will not, as a general rule, affect the party entitled." Angel on Lim., sec. 371-415; Buswell on Lim. and Adv. Poss. sec. 271. How can the remainderman or reversioner be protected against such *laches* in failing to sue except by holding, either that the statute commencing in the woman's life is suspended, if there is but one right of entry, or that the heirs have a new right of entry born on the death of the tenant by curtesy?

But the question of a hostile stranger entering is not the ques-tion in this case. We have the case of one buying from the wo-man's husband the whole tract by conveyance passing the whole right, including curtesy. Nathan Higgins could not sue the pur-chaser, and the heirs could not, because to sustain ejectment there must be a right to present possession, under Code, chapter 90, section 4, and *Adkins* v. *Spurlock,* 46 W. Va. 139.

Another question is this, did the conveyance to Higgins and wife create an estate by entirety, or had that estate been then abolished?

If that estate was then existent, the contract of exchange be-tween Higgins and Starkey gave Starkey lawful right to hold during the joint lives of Higgins and wife, and also during the life of Nathan Higgins after the wife's death by reason of curtesy, and the statute of limitations did not begin in the life-

time of Mary Higgins, as she had no right of entry and could not sue Starkey, nor could her husband, and there could be no color to say that a right of entry or suit vested in her heirs until his death. Subject to survivorship the husband "is entitled during coverture to the full control and usufruct of the land to the exclusion of the wife, and has, according to the weight of authorities the power to sell, mortgage, or lease for the same period, and his life interest is subject to the claims of creditors." 15 Am. & Eng. Ency. Law 849 ; *Pay* v. *Stebbins,* 141 Mass. 219, (55 Am. Dec. p. 465). When we read that neither can sell, that only means that they cannot thus destroy the right of survivorship. 18 Am. Dec. 386. It would be the same as a sale by the husband of a wife's land not separate estate, in which he had present right of possession, in which case adverse possession affecting her right would not exist until the husband's death. *Central Land Co.* v. *Laidley,* 32 W. Va. 134; Kerr, Real Prop., sec. 1976. But when this land was conveyed to Higgins and wife, section 3 of chapter 66, Code of 1868, was in force giving the wife power to take and to hold to her separate use land and its rents and profits as if unmarried, and denying power in the husband to dispose of the land or its rents and profits. This would give the wife sole possession, and it would seem to prevent estates by entirety from arising thereafter as they did before that statute. In a few states it has been held that the separate estate acts do operate to abolish estates by entirety. Those cases hold that such estates spring from the old common law rule that man and wife are one person, and therefore an estate conveyed to them is a unit of indivisible parts; they hold *per tout et non per my* (by the all and not by the moiety), while a conveyance to two persons, not man and wife, makes a joint tenancy, making a unit of divisible parts, joint tenants holding *per tout et per my;* and that separate estate acts were designed to do away with the legal rule that as to property man and wife are one. Those decisions say that as these acts provide that the wife shall hold the land and its profits as if single, that excludes all idea that the husband can have possession of his wife's half, take its profits, lease it, convey for his life, as he could do with his wife's maiden land by the common law, since the new acts were passed to destroy the common law right in toto, and to hold that estates by entirety still exist would defeat that object.

Separate estate acts mean, I think, not simply to give the wife possession of her half and its profits free from her husband's.control and disposal, but also to take away his right to retain his wife's interest by survivorship on her death, because the acts say that she shall take and hold "in the same manner and with like effect as if she were' unmarried, and the same shall not be subject to the disposal of her husband, nor be. liable for his debts." I would think that this is the plain import of our separate estate act. Robinson's Appeal, 51 Am. St. R. 367; 18 Am. D. 388; *Chandler* v. *Chaney,* 37 Ind 413; *McCurdy* v. *Canning,* 64 Pa. St. 41; *Cooper* v. *Cooper,* 76 Ill 57.

But it will be found that the very decided weight of authority from other states is to the effect that the married woman's act do not abolish estates by entirety. Our own' act comes from New York, and there the holding has been that it was not the' effect of the section, and plainly was not its purpose, to change the force and operation of a conveyance to a wife. It does not enlarge the estate which a wife would otherwise take in land conveyed to her, and whatever the effect of a conveyance to a husband and wife was, prior to that statute, so it remains. If the operation of such conveyance was to pass the entire estate to each of the grantees, so that each became seized of the entirety, there is nothing in the force or effect of the language used to change the operation of such a deed. as to make the grantees tenants in common. The section gives the wife no greater right to receive conveyances than she had at common law, but its sole purpose was to secure to her during coverture, what she did not have at common law, the use, benefit and control of her own real estate, and the right to convey and devise it as if unmarried. *Bertles* v. *Nunan,* 92 N. Y. 152; 44 Am. R. 361.

A mass of law sustains this position. *Marburg* v. *Cole,* 49 Md. 402; *Baker* v. *Stewart,* 40 Kan. 442; 10 Am. St. R. 213 and note p. 99; *Prey* v. *Stebbins,* 142 Mass. 219 (55 Am. R. 462) ; *Robinson* v. *Engle,* 29 Ark. 202; *McDuff* v. *Beauchamp,* 50 Miss. 531; 2 Jones on Convey., sec. 1793 (15 Am. & Eng. Ency. Law (2d ed.) 850) ; 1 Wash. R. Prop., sec. 915; 3 Kerr R. Prop., sec. 1976.

The case of *Bank* v. *Cordor,* 32 W. Va. 232, has no bearing on

the point in hand because in it the land was conveyed to the man and wife before the separate estate act. In the case of *Bertles* v. *Nunan,* cited, the court did not consider what effect the separate estate act had on entirety estates as to use and control by the husband during coverture in the wife's interest; but in a later case, *Hiles* v. *Fisher,* 144 N. Y. 306 (43 Am. St. R. 762), 30 Law R. Annotated 305, it is again held that the separate estate act does not destroy estates by entirety, yet it deprives the husband of the sole control of the wife's interest during their joint lives, takes away his power to lease, because, as the court said, this right in the husband was not a quality of an estate by entirety, and did not arise from it, as, if it did, it would not be abrogated by the separate estate act; but that such power in the husband was a power in him by common law as to the wife's maiden land, and the separate estate act took that from him. She was held entitled like a joint tenant to half the rents and profits with him. The case followed *Butler* v. *Rosenblath,* 42 N. J. Eq. 651 (59 Am. R. 52). But I do not regard these decisions in other states as controlling in this state. They were based materially on the fact that a cardinal quality of an estate by entirety was the right of survivorship; they did not consider that the separate acts intended to abolish that element in conveyances operating by common law to vest an entirety estate.

Survivorship in joint-tenancy had been abolished; but it was not considered that statutes turning joint tenancies into tenancies in common, and thus abolishing survivorship, touched estates by entirety. *Bertles* v. *Nunan,* 44 Am. R. 363; *Prey* v. *Stebbins,* 55 Am. R. 462; *Robinson* v. *Engle,* 29 Ark. p. 206. So, it was held that the act abolishing survivorship between joint tenants did not apply to that peculiar estate known as an estate by entirety. *Thornton* v. *Thornton,* 3 Ran. 179. Therefore, in estates by entirety the unfair rule that on the death of the husband or the wife the survivor took the whole, still prevailed; but by a provision in the Virginia Code of 1849, going into force 1st July, 1850, chapter 116, section 18, it was enacted that "If hereafter an estate of inheritance be conveyed or devised to a husband and his wife, one moiety of such estate shall, on the death of either, descend to his or her heirs, subject to dower or curtesy, as the case may be." This destroyed survivorship in

estates by entirety. This statute is found in the West Virginia Code, chapter 71, section 18.

A reason exists from this in this State for saying that estates by entirety have ceased, since the married woman's act, that does not exist in other states. Survivorship has perished under the Code of 1850; the right of the husband to control and take the profits of and convey for his life the interest of the wife in entirety estates has been taken away by the separate estate act. What is left of an estate by entirety? Is its indivisibility or impartibility still left? I think not, as I think the statute of partition applies to it. From these considerations I conclude that we cannot say that the statute of limitations does not apply because Higgins and wife had an estate by entirety, since I think that by the joint operation of the act abolishing survivorship between husband and wife and the separate estate act Higgins and wife held the land as joint tenants, not an estate by entirety. But Higgins had curtesy after his wife's death.

There is a second reason why the plaintiffs' right is not barred by the ten year limitation. Nathan Higgins, in the lifetime of his wife, sold to Starkey the whole tract, as if he were sole owner, by an executory contract in terms providing for a future deed to convey the legal title, the purchase money also payable in future, and then Starkey went into possession, and later Mary Higgins died, and still later, Nathan Higgins made such deed to Starkey. The burden of the argument for the defense is, that the statute having begun to run in the lifetime of Mary Higgins had run out its ten years before this suit began. An answer is that Starkey's possession began and continued during the life of Mary Higgins, under that executory contract, and was never for one moment adverse to her, and never in any view could become adverse until the death of the husband. No cause of action accrued in the lifetime of Mary Higgins. Some authority from a few states is cited to show that the possession of a purchaser under an executory contract is adverse, not only to a stranger title, but as to the vendor also. We cannot so hold in the face of so much binding authority at home, which authority holds that possession is not adverse to the vendor. *Ketchum* v. *Spurlock,* 34 W. Va. 597; *Core* v. *Faupel,* 24 *Id.* 239; *Hudson* v. *Putney,* 14 *Id.* 561; *Clark* v. *McClure,* 10 Grat. 310; *Wlliams* v. *Snidow,* 4 Leigh 14.

The defense would reply to this position that whilst Starkey's possession was not adverse to Nathan Higgins, Mary Higgins was another person, she and her heirs, and that the law is that possession even under an executory contract is adversary to strangers, and so it was as to Mary Higgins and her heirs. This is a very refined distinction.

To say that when one of two joint tenants sells by a contract the whole land, so that the holding under it is not adverse to him, it is as to his fellow. He sells a unit. How can we thus split it? Higgins and Starkey treated it as a unit, but still it is not a unit as to Mrs. Higgins. They contemplated no bi-section. The possession could not bear one hue or character as to one joint tenant, another as to the other. Starkey entered that tract in recognition of the title of Nathan Higgins to the whole tract as an entire thing, recognized a still subsisting title in Nathan Higgins for the whole, as the cases cited say that when a purchaser enters under an executory contract, as a matter of law, whatever his real mind, he thus recognizes a still subsisting title in the vendor to the tract sold; and this being so, and the sale being one of the whole tract, that entry imports a still subsisting title in Higgins for the whole tract, and that would inure to the benefit of the cotenant, Mary Higgins, and the possession not having the quality of adverseness to Higgins, neither had it as to his wife. This character of non-adverseness continued, from the character of the writing, until Higgins made a deed after his wife's death. If one tenant in common convey the whole by deed passing legal title it is an ouster of his co-tenant, but not if it is only a contract for title, for it is not adverse there to either owner. There had been no partition between Higgins and wife. They claimed and held possession as joint tenants, *per my et per tout;* the physical possession by Starkey of each and every acre was the same as that of each and every other acre.

The possession of one joint tenant or tenant in common or parcener is the possession of the other, and the possession of Starkey being under one co-tenant, and not adverse to him, it was the friendly possession of the other. It bore the same caste as to Mary Higgins that it bore to Nathan. She was a joint tenant with him. I find a case bearing on this feature of the present case, *Ormond* v. *Martin,* 37 Ala. 598. A pur-

chaser under a bond conditioned to make a deed took posses-
sion. The bond was made by an agent who had authority from
several joint owners, but not from others. The court held the
possession not adverse to any of the owners, saying: "The
character of the possession is the same as to all the owners;"
that is, it not being adverse to some, it was not adverse as to
other co-tenants.

When possession under the executory contract ceased with the
execution of the deed by Higgins to Starkey, then the posses-
sion became adverse to Higgins, but not to the heirs of Mary
Higgins, for the reason that an estate by curtesy was, at that
date, actually vested in Nathan Higgins, and Starkey was en-
titled by his deed to hold the half of Mary Higgins until her
husband's death, and right of entry and action never ac-
crued to the heirs until his death. *Cent. L. Co.* v. *Laidley,* 32
W. Va. 134; *Arnold* v. *Bunnel,* 42 *Id.* 473; *Merritt* v. *Hughes,*
36 *Id.* 356; *Austin* v. *Brown,* 37 *Id.* 634.

But let us separate Mary Higgins from her husband and say
that the fact that possession was not adverse to Nathan Higgins
would not protect her right from limitation. Treat her as a
stranger with a stranger title, not in privity with her husband's
title. In reading up this case this question occurred to me: Is
the executory contract, not purporting to convey legal title, but
stipulating for future conveyance of title, good color of title to
sustain adversary possession?

I do not find that the question has been pointedly considered
and decided in the Virginias, and it is of some importance that
it be discussed. Color of title is essential to give adverse pos-
session to the whole boundary claimed so as to apply the statute
of limitations. *Jarvis* v. *Grafton,* 44 W. Va. 453; *Core* v. *Fau-
pel,* 24 *Id.* 242.

A writing must, to give color of title, show an apparent trans-
fer of title. "Consequently, as a mere executory contract or
bond to convey does not itself purport to transfer title, but
only promises a conveyance in future, such instrument does not
ordinarily confer color of title." 1 Am. Eng. Ency. Law 859.
In addition to cases there cited, I note *Isaac* v. *Edwards,* 7
Humph. 465, and *Rigor* v. *Frye,* 62 Ill. 507, the latter case hold-
ing that a "bond conditioned for execution of a deed on com-
pliance with its terms in future is not color of title." 3 Washb.

R. Prop., sec. 1981, so states the law. In *Osterman* v. *Baldwin,* 6 Wall. 116, a land company issued a certificate of purchase showing that it had sold a lot, received payment for it and promising to make a deed in future. The act involved required possession for three years under "title or color of title." The Supreme Court held: "If this writing, upon its face, professed to pass title, but failed to do it, either because the city company had no title, or for want of proper execution, it could be used as color of title. But an agreement to convey title at some future period is not color of title within the meaning of the law." I am surprised to find so much law to this effect. I have made patient search, and though innumerable instances of papers making color of title are found, I have not found many making contracts for title color of title, though it must be that innumerable cases of their use have occurred. It will be noticed that in our own cases language is used importing that any claim of title, "legal or equitable," will do. *Swann* v. *Thayer,* 36 W. Va. 46, following cases there cited; *Bennet* v. *Pierce,* 50 *Id.* 604. From this language it might seem that a title bond or a contract would furnish color of title; but a deed purporting to pass title instantly would be good color, though in fact its maker had no legal title, but only in equity, as where one having right only under a title bond makes a deed purporting to presently convey legal title. I have found no case where the point was actually considered. In our cases, except *Adkins* v. *Spurlock,* 46 W. Va. 139, showing such liberality as to instruments giving color, the documents were those purporting to pass then and there actual title. Liberal as is the holding in the cases just cited, the general law seems to call for a paper giving "semblance or appearance of title," "Any instrument, however defective, no matter from what cause invalid, purporting to pass or convey title to land."

In *Adkins* v. *Spurlock,* the question is not considered, though as it was directly involved, the adverse possession resting on an executory contract, we must count that case as authority for the proposition that such a contract is good color of title. For reasons about to be given, I think that decision is sound law. The profession in the Virginias has, I would say, generally regarded an executory contract good color for adversary possession against strangers to the contract, and I have been surprised to

find so much law to the contrary. The law elsewhere is based on the theory that a mere contract to convey confers no present estate, and in a court of common law is utterly unknown as a muniment of title, and is known only in equity, where it gives only an equity. It does not purport to pass even present semblance of title. By the common law one purchasing by executory contract has no right to possession until he gets his deed, unless the contract so provides, but is only a tenant, if in possession. It is different where a deed is made passing legal title; that gives instant right to possession as following the legal title, the title drawing with it right of entry. Under an executory contract the vendor could turn the purchaser out of possession by entry or ejectment, so little does such a mere contract avail at law, the vendor retaining legal title, which vests him still with the right of possession. Newell on Ejectment, sec. 18; 2 Min. Inst. 229. There are some cases elsewhere holding an executory contract sufficient color of title against all persons except the vendor. *LaFrambois* v. *Jackson,* 8 Cowen 589, 18 Am. Dec. 463; *Elliott* v. *Mitchell,* 47 Tex. 445; *Bell* v. *Coates,* 56 Miss. 776; 88 Am. St. R. 718. The *Frambois Case,* just cited, makes the fact that purchase money has been paid entitling the purchaser to a deed essential to constitute the contract color of title; but the *Texas Case* says, as I say, that is immaterial. Between the parties the possession is not adverse; and as to strangers, what is it to them that the contract has or has not been complied with? It is none the less a holding hostile to them. So, we find respectable authorities holding under the common law that such a contract is good color for adverse possession, and where is the substantial soundness for a contrary position? If I sell to A, a boundary of land and put him in possession under written contract binding me to convey that boundary, where is the sense in allowing a hostile claimant, against whom A has held for the statutory period, to say to A, "You have no legal title or semblance of title?" A should be allowed to present his actual possession and impute it to his vendor's title for color. And view him only as a tenant, and surely the writing would give him that character at law, why could he not defeat the adversary claimant? But if this position be not sound, then I refer to Code, section 20, chapter 90, providing that "A vendor, or any person claiming under him, shall not at law recover

against a vendee, or those claiming under him, lands sold by such vendor to such vendee, when there is a writing stating the purchase, and the terms thereof, signed by the vendor or his agent." And then, too, I may refer to Code, chapter 98, clause 6, saying that no one shall without a writing be chargeable "upon any contract for the sale of real estate, or of the lease thereof for more than a year." These statutes give an executory contract for the sale of land validity, operation and effect in all courts, law or equity. The first utterly changes the rule that a vendor can turn out his purchaser. He must now go into equity to enforce his rights according to the contract, and can no longer recover possession at law, whether the purchaser owes for the land or not. *Suttle* v. *R. F. & P. R. Co.,* 76 Va. 284; *Dobson* v. *Culpepper,* 23 Grat. 354; *Williamson* v. *Paxton,* 18 *Id.* 475; Hutchinson Land Titles, sec. 476; 2 Min. Inst. 229.

Upon these statues I hold that such a contract is recognized at law even against the vendor to defend the vendee's possession, (though not as color of title, and for a stronger reason has it virtue against a stranger to show color of title) and give bounds to the possession.

I have considered the effect of possession by Starkey during the life of Mary Higgins and up to the date of the deed from Nathan Higgins to Starkey under the executory contract; but what is the effect of Starkey's possession after that deed? I have virtually answered this question above. Counsel argue that the heirs of Mary Higgins were co-tenants with their father, and that the conveyance by him to Starkey of the whole tract was an ouster of the heirs, and the statute commenced to run at latest from the date of that deed. There are two reasons why this cannot be so. One is that the tenancy by the curtesy was then vested in Nathan Higgins and his deed gave it to Starkey. If no sale or conveyance had been made by Higgins, he would have had for his life sole and exclusive possession of his wife's half of the tract, and the law is that the life tenant's possession is in harmony with, not adverse to, the reversioner or remainder-man. The heirs had no right of entry against their father or one claiming under him. *Merritt* v. *Hughes,* 36 W. Va. 356; *Austin* v. *Brown,* 37 *Id.* 634. So, when the father conveyed, he conveyed that life estate, and the holding of Starkey during its continuance was not adverse to the heirs. Sec. 3, of *Austin*

*v. Brown,* cited, so holds.  But it is asserted that such possession was adverse because the father conveyed the fee to the
whole tract, and that this was an ouster of the heirs.  We admit that if one joint tenant convey the whole, and the grantee
takes possession under his deed claiming the whole, the conveyance is an ouster of the co-tenant, and the possession adverse to
him, and the statute runs against him.  *Bennett* v. *Pierce,* 50
W. Va. 604; *Talbott* v. *Woodford,* 48 *Id.* 449; 1 Cyc. 1078; 1
Am. & Eng. Enc. Law, 806.  That is the case of simple co-tenants where each is at the instant of the conveyance entitled to
immediate possession; but it is not so in a case like this, where
one of the joint tenants has a right to possession, not only of his
own half, but also of that of his co-tenant for the former's life,
so that the co-tenant's right of possession is deferred by law
until the close of the life estate.  These heirs of Mary Higgins
had no right of entry for one moment from the last breath of
their mother to the last breath of their father, because of that
estate by the curtesy.  It is that curtesy which makes the difference.  That brings in the rule that the statute does not run
against the reversioner or remainderman until the life estate
ends.  *Arnold* v. *Bunnel,* 42 W. Va. 473; *Merritt* v. *Hughes,* 36
*Id.* 356; *Austin* v. *Brown,* 37 *Id.* 634.

It is not material that the conveyance was of the whole from
Higgins to Starkey and that Starkey claimed in denial of any
title in the heirs, because neither Nathan could sue Starkey, by
reason of his deed, nor could the heirs, by reason of that same
deed conveying an estate good against the heirs until the death of
Nathan Higgins.  If it be said that after the deed Starkey's
possession was adverse to Nathan Higgins and therfore also adverse to the heirs, the reply is that if the life tenant suffer an
ouster, those vested with subsequent estate need not sue, even if
they can, as in case of distinct adverse title, but may wait until
the end of the life estate, on principles and authorities given
above, as a new right of entry comes to them for the first time
at the close of the life estate.  Buswell on Lim. and Adv. Poss.,
sec. 270, says, "Rights of Reversioner preserved.  It was a
general rule of the common law that an undisturbed and uninterrupted possession for sixty years created a complete title in
the possessor as against every other person; but this is only true
when the claimant or demandant not in possession might have

asserted his right to enter at any time during the sixty years. Thus an estate for life or years may continue for upwards of sixty years, and yet the reversioner may, at the expiration of such estate, prosecute his right of entry by ejectment. As in theory the remedy only, and not the right, is barred by the statute, it is possible that an intervening estate might be enjoyed for centuries and then be at last recovered."

That was the case even where the titles are distinct; but in this instance there is but one title, and the hands of the heirs were tied by imperative law until the close of the curtesy estate.

I find the case of *Adkins* v. *Spurlock,* 46 W. Va. 139, sustaining this position. Two heirs of a mother held her estate subject to their father's curtesy. He conveyed his interest to them; but a claimant under another title had been in possession for the statutory period. In a suit, by the heirs while the father yet lived we held that his deed passed nothing to the heirs, as his life estate had, by the statute of limitations, passed to the hostile occupant, and the heirs could not sustain ejectment while the father lived; but we recognized their right to sue when the life estate should come to an end. Equally, more so, is such the case in the present instance where the father has conveyed his life estate to Starkey, and Starkey was in by right until the end of the life of Higgins.

The other of the two reasons mentioned above why the deed from Higgins to Starkey is not an ouster of the heirs starting the statute against them is, that to make a conveyance of the whole tract by one joint tenant to a stranger so operate, there must be a possession taken under that deed, attributable to it alone. Freeman on Co. Ten., sec. 226; *Hannon* v. *Hannah,* 9 Grat. 146. "The making of a deed for the whole property by a co-tenant to a stranger is not such act of ouster, unless actual adverse possession is taken thereunder." *Parker* v. *Brast,* 45 W. Va. 399 (point 5). It is on similar principles held that if one asks to enforce an oral contract for purchase of land he must show entry into possession under it in execution of it. *Gallaher* v. *Gallaher,* 31 W. Va. 9. In the case in hand Starkey was already in possession lawfully under the executory contract, and he made no change, but simply continued on under it, did no fresh act of assumption of possession, and we cannot say that his possession is ascribable to the deed; rather should we say

that his continuance in possession is to be ascribed to the executory contract.

The South Penn Oil Company says that even if Starkey's possession does not bar the plaintiffs under the ten year statute, it cannot be ousted of possession or called to account because it leased the land for oil and developed the same, and under its lease had held possession for more than three years before this suit was brought and is protected by chapter 61, acts 1872-'73, which reads as follows: "That any person or persons, in peaceable possession of lands claiming title under a lease of the same for the purpose of operating for oil or minerals, and who may have continuously remained in such possession for the space of three years, and have bored for, and in good faith expended money in such boring and operating, shall be entitled to plead such facts in bar, and said facts shall be a bar to any action at law or in equity instituted to establish title to recover possession of said lease, or to recover the profits received therefrom; provided, that nothing in this act contained shall be so construed as to authorize a tenant to set up as a bar to a recovery an adversary possession against his landlord, and that this act shall not affect any suit brought within twelve months after the passage of this act."

It may be questioned whether this act at all enters into this case. It may be questioned whether it applies at all between a claimant in fee of the land and a lessee, between one claiming the land in opposition to the lease and the lessee. It may be applicable only in a contest between claimants of the lease. It is indefinite and badly drawn; but let us say that it has the broader application; several questions occur under it.

Is this act still in force? Or was it repealed by the act of 16th March, 1882, found in chapter 104, of the Code? Its object was to amend and re-enact chapter 104, of the Code as it had before existed. Its general comprehensive subject is "limitation of suits."

I may say that the act gives periods of limitation for suits generally. One of its subjects is "Limitation of entry on, or Action for Land." This is very broad; it covers right to recover land by one claiming in fee, for life, for years; actions to recover possession, that being an essential element of title. So, the act of 1873, is an act to limit a suit to recover possession of

land. Both acts therefore limit the time for recovery of posses-
sion. One gives ten, the other three years, and they seem in-
consistent. But for the act of 1873, I suppose that an action
against one in possession under an oil lease would be ten years,
as it would be against any other occupant, under chapter 104;
but after the act of 1873, it would be three years.

This fact shows inconsistency between the two acts; in other
words, the act of 1873 by strong implication, amended section
1, of chapter 104, as it had before been. Afterwards, in 1882,
the legislature re-enacts section 1, chapter 104 in the very words
it contained before the act of 1873, making the future law, and
making no exception of oil leases, giving them no shorter limita-
tion than actions for recovery of possession in other cases, but
bringing them under the ten-year limit, unless the act of 1873
still stands out alive unaffected by the act of 1882. The act
of 1882 closes with the section, "All acts and parts of acts incon-
sistent with the provisions of this act, and coming within the
purview thereof, are hereby repealed." This repealing section
has great import and force.

I have stated that the act of 1873 is inconsistent with the
Code, chapter 104, section 1. It is also within its purview; for
the purview is all the act after the preamble, the whole scope of
its enactment. "When an act repeals all former law within its
purview, the intention is obvious to sweep away all existing
laws upon the subject with which the repealed act deals. The
purview is the enacting part of the statute in contradistinction
to the preamble, and a repeal of all acts within the purview of
the repealing statute should be understood as including all acts
or parts of acts in relation to all cases which are provided for by
the repealing act, and no more." Sutherland Stat. Construct.,
sec. 137.

Now, the act of 1882 surely legislates on the same matter
covered by the act of 1873, as it gives a limitation to actions for
the recovery of the possession of land. To repeal an act under
it, that act must not be merely within its purview, but must
also be inconsistent. So, I think the repeal of the act of 1873
is expressed in the act of 1882.

The act of 1873 was regarded as necessary to take oil leases
out of section 1, chapter 104 of the Code. If so, why does not

the literal re-enactment of Code section 1, not saving oil leases, put them back as before the act of 1873?

The opinion of JUDGE DENT in *Totten* v. *Nighbert,* 41 W. Va. 800, sustains the position above stated, as to repeal by expression. An act in 1871, provided that a tax sale should confer all the State's title acquired by sale of taxes upon any one who should buy the land afterwards at a tax sale. Later an act passed, chapter 31, of the Code, a general statute covering the whole subject of tax sales and the title vested in purchasers thereby, just as chapter 104, covers the whole subject of limitations of actions for recovery of land, and it repeals all acts inconsistent with it. The Court held that the act of 1871 was repealed by the expression of the act of 1882, and also that of 1872-3 by reason of said repealing clause.

The later act made full provision as to what title should pass by a tax sale, but contained nothing to give the sale force to pass the State's title, and thus impliedly, if not expressly, repealed the act of 1871. There is a consideration lending decided support to the view that it was not likely the intent of the legislature, and it should not be understood as meaning, to keep alive the act of 1873. That act makes a discrimination between persons not very readily approvable. Here is a person occupying land engaged in farming. He must be in peril from a hostile title for ten years before time gives him peace. On adjoining land is an occupant of an oil lease. He is kept in suspense only three years. The better title had the advantage of ten years in one case and another of only three years. Against this view it is argued that the act of 1873 is a special act applying a special limitation for oil leases, shorter because oil developers spend large sums in development, and the act tends to improvement of the country to favor them; but men that fell the forest and build fences and homes spend labor and money.

Many others than oil lessees spend large sums in improvement. But it is said that the act of 1873, being thus special, and chapter 104 of the Code general, the former is not repealed by the latter. There is some law to support this claim. *Sturms* v. *Fleming,* 31 W. Va. 701, may be cited for this purpose. An act provided that the time during which the suitors test oath prevailed should be excluded from computation under the statute of limitations in favor of one who could not take that oath, and it

was held that the re-enactment of chapter 104 on limitations, though it did not except such cases, did not repeal the special act. But there is the later case of *Totten* v. *Nighbert,* cited above. The argument is made that section 1, chapter 104, of the Code of 1868, is literally the same as its re-enactment by the act of 1882, and that its re-enactment did not make it a new law; that there was never a moment since 1st April, 1869, when it was not law by reason of the principle that when a statute continues former statute law that law common to both acts dates from its first adoption, and only such provisions of the old act as are left out of the new are gone, and only new provisions are new laws. *State* v. *Mynes,* 38 W. Va. 125, (point 7) ; *Bruns* v. *Hayes,* 44 *Id.* 503. I suppose the idea is that there was the Code of 1868. Then the act of 1873 operating as an exception to its generality; then the act of 1882 repeating the very words of the Code of 1868, leaving the act of 1873 as if standing aside unharmed. But I would say that is more logical to hold that as the legislature knew of the act of 1873, and did not insert in 1882 the exception made by it, the intention was to repeal it.

There is another reason why the three years' statute does not protect the South Penn Company. It has not proven that it entered upon and bored for oil on the Higgins land three years before suit. It must so show. Starkey and wife leased to that company a tract of one hundred and four acres made up of seventy-four acres, part of the one hundred acres conveyed by Edgill to Higgins and wife, and the balance of other and distinct land.

In August, 1895, the company went upon the land and began work of development; but that was not on the seventy-four acres. The second well was on this Higgins land, but that well was not begun until December, 1895. The company claims that its possession and work on that part of the lease outside the seventy-four acres was possession and work on the whole. Generally, possession of part under a color of title is possession of the whole; but where the land within the boundary given by the instrument includes land of two separate owners, and the actual *pedis possessio* is only on land claimed by one of those persons, and there is no actual *pedis possessio* on land of the other, there is no constructive actual possession as to the claimant whose land has never been invaded by actual physical possession. He

cannot sue until the foot of his adversary is planted on his land.

The mere claim of that adversary does not call his adversary into action. The South Carolina court said: "There can be no constructive adverse possession of land against the owner where there has been no actual possession which he could treat as a trespass and bring action for." *Steedman* v. *Hilliard*, 3 Rich. 101; Buswell on Lim. & Adv. Poss. sec. 256; 1 Am. & Eng. Ency. Law, note 3, p. 865.

Moreover, the curtesy did not end so the heirs could sue until 1898, when Nathan Higgins died, and that would protect the heirs against the three years' statute as well as the ten years' statute.

Another important question has presented itself to my mind. Is the title of the act of 1873 sufficient under section 30, Art. 6 of the Constitution, reading, "No act hereafter passed shall embrace more than one object, and that shall be expressed in the title." The title of this act is, "An act concerning the limitation of actions in certain cases." This is very general and indefinite. It concerns the limitation of actions, but what actions, how or wherein it concerns them, it does not indicate or hint. For what action does it propose a limitation? or in what cases or character of cases it does not indicate. It is true that the title of an act need not be a detail or index of the contents of the act, but it must reasonably and fairly indicate its object and subject, as stated in *State* v. *Mynes*, on page 139, of 38th W. Va., on the authority of *MonClair* v. *Ramsdell*, 107 U. S. 147. See 79 Am. St. R. 464; *McEldowney* v. *Wyall*, 44 W. Va. 711.

The "object" of an act is the aim or purpose of the enactment. while the "subject" is the matter to which it relates and with which it deals. *State* v. *Ferguson*, 104 La. 249, (28 South. 917), 81 Am. St. R. 123. This does indefinitely give the subject of the legislation, that is, legislation concerning limitations; but does it indicate the aim, object, purpose? It does not indicate an intent to fix a limitation of suits to recover oil and mineral leases. It is not a general act of limitations, but only in certain cases, and those not indicated. Its aim is not given further than it imports legislation touching the statute of limitations, in certain cases. What cases is not indicated, and there are dozens of subjects to which limitations apply, and those of diverse nature. I think "An act to prescribe the limitations of actions

and suits" would be a good title; but here it is not such; it says it is an act concerning limitations, but not stopping there, it confines such limitations to "certain cases," and those it fails to give, those words seeming to me to call for a specification. The act does not intimate that it concerns oil leases. You could not learn that without reading the act. The title does not tell you so.

I grant, as a rule necessary to avoid unreasonably hampering the legislature, that it is only necessary that the title should not detail, but merely indicate the object in a general way. *Mont-Clair* v. *Ramsdell,* 107 U. S. 147; 64 Am. St. Rep. 73. It is not required that the title detail the items of the object of the act, or every enactment that is germane and cognate to the title, for if it be not germane, the enactment is bad, both because not germane to the title and there is a distinct object not expressed. But our point is whether there is a sufficient title. The reason for requiring the object to be expressed is, that the members of the legislature and the people shall not be misled by the title; to prevent surprise in legislation; to attract the attention of both to the particular object.

It must not be so general as to conceal the real enactment, the real aim. *Brown's Case,* 91 Va. 772. It may be general, but must be specific enough to fairly give notice of the actual enactment. Suth. Stat. sec. 88. Cooley's Con. Lim. 173, says that the title must point to the enactment so far as to prevent fraud or surprise by means of provisions of which the title gives no intimation, and which might be overlooked and carelessly and unintentionally adopted, and to fairly apprise the people, through the publication of legislative proceedings usually made, of the subjects of legislation, in order that they may be heard by petition or otherwise. If the title "clearly and distinctly expresses the whole object of the legislation," it is sufficient, is the rule put in *Carter* v. *Sinton,* 120 U. S. 517. Does the title in question do this? I think not.

Counsel for the South Penn Co. cites *Perdue* v. *Caswell,* 40 W. Va. 372. It did not at all consider whether the act of 1873 had been repealed or was constitutional, but simply held that a plea setting up an oil lease as protected by it was not a good plea for failure to specify the lease; that is, the plea did not raise the question of the act in anywise.

The subject of the validity of the act of 1873 when tried by amendment 14 of the national constitution is not passed on, as it is not relied upon by counsel for the plaintiffs. So, we conclude that the act of 1873 does not bar the right of the plaintiffs against the oil companies.

It is claimed that the plaintiffs are barred of recovery by estoppel *in pais* from conduct of Mary Higgins and those claiming under her. When asked what constitutes the estoppel, a brief answers that Mary Higgins knew that Starkey was negotiating the exchange of tracts with her husband, or must have known, and that it had been consummated and carried into effect by removal of their son from the 100 acre tract, and by the taking of possession by another son of the 50 acre tract received by Nathan Higgins in the exchange, and the delivery of possession of the 100 acres to Starkey, and of the 50 acre tract to a son of Mary Higgins, and her knowledge that Starkey was claiming the land as his own; and that she said that she was glad of the exchange. The utmost that we can find to operate against Mary Higgins and her children is silence, except that a witness says he heard her say, in a casual conversation, that she was glad of the exchange, as her son, who lived on the 100 acres, could not get along with a neighbor. This was after the exchange. It did not cause or further the trade. It did not induce Starkey to change his condition or induce the oil companies to spend money. To constitute an estoppel it must have so operated. *Railroad* v. *Perdue,* 40 W. Va. 442; *Bettman* v. *Harness,* 42 *Id.* 433. Starkey was not present, and it is not shown that he ever heard of this remark of Mary Higgins. It was only a remark. It has not the gravity necessary to make an estoppel. As to Mary Higgins' knowing of the exchange, it is not claimed that she had any active participation in it; she simply was silent. That is not enough. In *Heavener* v. *Godfrey,* 3 W. Va. 426, it was held that a wife had not lost her right to a fair partition by the fraudulent acts of her husband nor by her explicit participation in and consent to a partition made by her husband with another. Mrs. Godfrey was active; Mrs. Higgins only silent and passive. We all know, from our knowledge of human nature and experience in human affairs, that married women are not alert to assert their rights or dissent from the action of their husbands. In fact Mary Higgins was then in late

stage of consumption and very soon died. She was in no condition to be charged with full knowledge and acquiescence in this transaction, so far as to charge her with an estoppel. But she did nothing but maintain silence. She is guilty of no act of fraud. The Code allows a woman to pass her land only by a deed joined in her by her husband, and acknowledged by both. Can she convey by mere silence, as is claimed in this case? Can she thus lose her land? This subject is discussed in *Williamson* v. *Jones,* 43 W. Va. 571-578, and it is there held that by even fraudulent conduct she cannot lose her land. She may make a void deed, afterwards admit its validity, and see her grantee make valuable improvements, yet is not thereby barred of her right to her land. Positive fraud is essential to bar, if even that will take away her land by estoppel *in pais.* 15 Am. & Eng. Ency. Law (2d ed.) 802. There is nothing shown against the plaintiff to work an estoppel by conduct except silence. There must be some overt act to show intent to mislead. *Bates* v. *Swiger,* 40 W. Va. 420. A man is not bound to speak, unless he is so situated as to the rights of others that the law calls upon him to speak out. *Greer* v. *Mitchell,* 42 W. Va. 494; 64 Am. St. R. 920). The true owner need not seek an adverse claimant and tell him of his rights. *Williamson* v. *Jones,* 43 W. Va. 562 (point 8); 64 Am. St. Rep. 891, note p. 920. A clear, strong case of estoppel must be made out where a clear legal title to land, requiring written conveyance to pass it, is to be divested out of its owners and vested in others as if a conveyance had been made. *Williamson* v. *Jones,* cited. The mere expression of satisfaction with the exchange made by Mary Higgins is utterly abortive to lose her title; for if she had expressly admitted that Starkey had her title, that would not divest her of it, even if she had been single, and much less being married, in the face of the statute requiring a deed. *Suttle* v. *Railroad,* 76 Va. 284; *Jackson* v. *Davis,* 15 Am. Dec. 451-459, cited in *Delaplaine* v. *Grubb,* 44 W. Va. 617, to this point. There is no ground to bar the plaintiffs on the basis of estoppel. It is not shown that Starkey or the oil companies, in reliance upon that casual expression of Mary Higgins (it does not appear that they ever heard of it), spent money or changed conditions, and without this, even as to persons *sui juris,* there is no

estoppel. *Western Co.* v. *Peytona Co.*, 8 W. Va. 406 (point 12) ; *Railway* v. *Perdue*, 40 *Id.* 442. And the person must have a purpose to mislead.

This decision may in its results bear hard on the defendants; but they have to blame themselves. The deed of joint estate in Higgins and wife was on record open to all. Nothing but neglect to take the simplest usual course to know the condition of title is the source of the trouble. A purchaser should look a little to see whether his grantor has good right. And, as just occurs to me, the very deed between Higgins and Starkey in words recited that the 100 acres had been conveyed to Higgins by the Edgell deed by date and page of record; thus warning him of that deed, and the exchange agreement called it the Allen Edgell land. Starkey simply risked good title, or bad, rather.

We reverse the decree of the circuit court, and send the case back to it to be further proceeded in according to principles above stated, and further according to the rules and principles governing courts of equity in such cases.

*Reversed and Remanded.*


Nᴏᴛᴇ ʙʏ Bʀᴀɴɴᴏɴ, Jᴜᴅɢᴇ:

Upon a petition for rehearing the court carefully examined the case and saw no ground for rehearing. It occurs to me to add this note to present a further view for the position taken in the above opinion that never for a moment was there any adverse possession until after the death of Nathan Higgins. I have stated above that it is impossible to say that as the possession under the executory contract was not hostile to Nathan Higgins, it was nevertheless hostile to his wife, and I say again that there could not be a possession adverse to half the tract, half the acre, half the pebble, half the molecule.

But reflect *further* that nobody will say that as to Nathan Higgins the possession as to the whole tract was adverse. Every one must admit that it was friendly. This being so, we then bring in the fact that between Higgins and his wife there was a relation of privity and unity, that of joint tenancy, and the same character the possession bore to Nathan Higgins it bore to his wife. The possession being by executory contract while the

wife lived, and not being adverse to him, neither was it adverse to her. He was her tenant as well as his tenant. Dry law views them as such. A court of law views them as such, and adverse possession is governed by this view. Had Higgins made a deed, instead of a contract, the possession would have been adverse to him, and being adverse to him, so it would have been as to her.

But even if the possession had been adverse to Mrs. Higgins while she lived, at her last breath the law cut off that adverse possessic ı because of her husband's curtesy. Her heirs were instantly larred from suit by an act of God, for which they are not responsible and they should not suffer therefrom. Upon her death the *law* gave their father curtesy and that prevented their suit, and they had to obey the law. So far as disability of infancy is concerned, the statute did not stop; as to it they could sue; but then that curtesy stood in their way, and it prevented them from sueing until the last breath of their father. That was not a disability, and is not tested by the law of disability. How can it be said, with reason or justice that when only two years of adverse possession had passed the heirs are barred? They are entitled to the full period given by the statute. It is immaterial to say whether the statute was suspended during curtesy, so as to allow possession before the death of the wife to be tacked to that after the death of the husband, or whether the possession during her life was tolled, taken away, and a new cause of action accrued after the husband's death.

The case of *Steel* v. *Gellatly,* 41 Ill. 39, supports the position taken in the above opinion as the import of *Jackson* v. *Johnson,* in saying that the statute cannot view until there is a person who can sue, and that "So decided have the courts been on this point that, although it is a general rule, when the statute has begun to run, it shall continue to run in spite of supervening disability. Yet in the case of *Jackson* v. *Johnson,* 5 Cowen 74, the court held that the statute having commenced to run actually ceased during the period when the person having the right had no legal power to enforce it. This question is, of course, wholly distinct from that of mere disabilities. Whether married women or infants, or any other class of persons having an estate, shall be considered as under disabilities, and therefore excused from bringing suit, or what time shall be allowed them after such disabilities are removed, are questions for the

legislature, and the courts have only to obey its behests. But the case we are considering is not one of technical disability in the ordinary sense of the term, where the persons having the right have also the legal power to assert it in the courts, but are excused on account of infancy or coverture, but it is one where the claim sought to be barred has been in such a position that it could not be asserted by any one. If a claim of this character could be barred, it would be simple confiscation, without crime, fault or *laches* on the part of the owner, and we cannot suppose the legislature so intended."

The law cannot deny action and yet confiscate property for failure to sue. So applied the statute would be unconstitutional.