# CHARLESTON

## Lewis v. Yates.

Submitted February 19, 1907.     Decided November 19, 1907.

62     575
65     635

1. EJECTMENT—*Vendee in Possession—Defenses.*

 For the purposes of ejectment law, a vendee in possession under a title bond is the lessee or tenant of his vendor and may defend under the title of the latter, either as perfect paper title, or as color of title. His possession being that of the vendor, he may defeat recovery by proof of legal title in his landlord, the vendor, by adverse possession. (*p. 580.*)

2. ADVERSE POSSESSION—*Color of Title.*

 Whether a title bond or other executory contract of sale of lands is color of title, discussed but not decided· (p. 581.)

3. SAME.

A deed made by a claimant under a patent, which interlocks with an older one, purporting to convey land lying partly beyond the interlock and within the boundaries of the senior patent, is color of title to the extent of the boundary lines therein designated, but it does not extend the boundary lines of the junior patent beyond their locations as they would be fixed and determined, had such deed never been made, and it remains color of title, as to land included in the older grant, only to the extent of its boundaries, determined independently of the deed. (p. 584.)

4. BOUNDARIES—*Interlock.*

A tract of land, supposed to lie between older grants, the patent for which, in describing it, calls for lines and corners of the older grants on one side, but makes no reference to those supposedly lying on the other side, must be so located by the jury in findng a verdict, as not to ignore the location of the older grants, lines and corners, called for in the patent, even though the location of the tract in question, as determined by observance of said monuments, cause an interlock with the older grants on the other side, not called for in the description. (p. 585.)

5. SAME—*Natural Monuments.*

In locating land from the description set forth in the deed or patent, natural monuments and marked lines must be allowed, ordinarily, to control courses and distances, if there is conflict; but, in such case, the evidence must be sufficient to identify, with reasonable certainty, the monuments in question as the monuments called for in the description. (p. 586.)

6. SAME—*Courses and Distances.*

When certain lines and corners of a survey are reasonably well identified or admitted and others are not, courses and distances must be allowed controlling force in determining the location of the latter, when the description by quantity is in substantial agreement with the area of the tract so located, even though there be slight evidence tending to show marked lines, differing from those determined by the courses and distances, (p. 590.)

7. TAXATION—*Forfeiture of Land Delinquent—Operation and Effect.*

Title to land, acquired by adverse possession, is forfeited to the state for non-entry on the land books, for taxation, and non-payment of taxes thereon, for a period of five years, in the name of some *bona fide* claimant thereof, under the colorable title under which title by adverse possession has been acquired; and, if the land lies within the boundaries of a claimant under a grant from the state, under which possession of a part thereof has been held for more than ten years, and the whole thereof

has been taxed and the taxes thereon paid, the forfeited adverse title is transferred to, and vested in, the claimant under the title as to which there has been no default in respect to taxation, by virtue of section 3 of Article XIII of the Constitution. (p. 592.)

8. Same—*Limitations Against State.*

The statute of limitations does not run against the State so as to prevent forfeiture of land titles for non-entry for taxation, under section 6 of Article XIII of the Constitution, or the transfer of forfeited titles under section 3 of said article. (p. 594.)

Error to Circuit Court, Greenbrier County.

Action by Cornelia A. Lewis against W. C. and James A. Yates. Judgment for defendants, and plaintiff brings error.

*Reversed. Remanded.*

Preston & Wallace, Williams & Dice, and John Osborn, for plaintiff in error.

Henry Gilmer, for defendants in error.

Poffenbarger, Judge:

Cornelia A. Lewis, in her declaration in an action of ejectment, against W. C. & James A. Yates, in the circuit court of Greenbrier county, seeks recovery of a tract of 470 acres of land, known as the William Donaldson grant, the William Powell survey and the Henning land. The patent was issued 'on the 4th day of February, 1801, granting the land to Donaldson, who was the assignee of John Deem, who was the assignee of William Powell, and the survey had been made on the 22d day of March, 1798. This land subsequently passed, by conveyance, to one Henning and then to Stuart, and from Stuart to Sehon, who sold it to Mrs. Lewis. Hence, it is frequently referred to in the record as well as in deeds, as the Henning tract. The defendants claim 57 acres out of what was known as the Andrew Hamilton tract, which 57 acres, according to the location claimed by them, lies partly within the boundaries of the Powell survey, located according to the claim of the plaintiff. The Hamilton survey was made on the 5th day of May, 1796, and called for 600 acres, and appears to lie for the most part northwest of the Powell survey. It is a large

37

·and irregular survey, having many lines and corners. The
.grant was made February 22, 1816, to Anthony Bowen, as-
·signee of Andrew Hamilton.　Bowen conveyed to Samuel
ᵗCarroll 475 acres of it.　Samuel Carroll, by deed dated De-
ᵥcember 10, 1837, conveyed part of the tract to Clement Car-
roll.　Clement Carroll, by deed dated May 17, 1852, conveyed
ᵗto John Stuart part of it, describing it as a tract of 57 acres.
-He had previously made a deed dated the 31st of March,
1852, conveying to John Yates, Jr., all of his interest in and
ᵗtitle to the farm on which he then resided, describing it as
ᵗadjoining the " Lands of Robt. McClintic, Joseph McClintic,
'Charles A. Stuart *dest.* Garland Brown and Jacob Hinkle"
and as supposed to contain " 300 acres more or less after de-
ducting fifty acres which said Carroll had sold Charles A.
Stuart, his *decst.* which fifty acres the said Carroll re-
serves."　John Stuart, to whom the 57 acres was conveyed
·seems to have been a son of Charles A. Stuart, where-
ᶠfore the deed for the 57 acres, described in the previous deed
:as fifty acres, was conveyed to him.　The defendants claim
ᵗthat Robert Rinehold, years ago, purchased this small tract
:from John Stuart, taking a title bond therefor but no deed,
:and that subsequently they purchased it · from Rinehold,
ᵗtaking an assignment of the title bond, which they say
ᵗthey have lost.　A title bond, from Stuart to Rinehold,
· calling for said tract of land, which was found among the
papers of John Stuart, appears in the record. The deed from
ᶜClement Carroll to John Stuart describes the 57 acre tract
·of land as being " on the waters of Byrne's Creek joining said
·Stuarts Henning place and his Banks lands and bounded as fol-
lows, to-wit:　Beginning at a white oak on a flat ridge cor-
· ner to Smith said Henning place N 79 W 94 poles to a small
. Dogwood on hill side near Byrnes Creek, and leaving N 26
: E 115 poles over a ridge to a hickory near a branch or a
ᵢline of said Banks tract and with S 54 E 112 poles crossing
ᵢbranch twice to a small *chesnut* oak on side of a point, in
ᵢlaurel, corner to & with said Henning place, S 40 W 74
ᵢpoles crossing small branch to the *begining.*"　A considera-
ble portion of this small tract lies, according to the conten-
tion of the plaintiff, outside of the Hamilton survey and
inside of the Powell survey, and the defendants and· those
under whom they claim have been in actual possession

thereof for a great many years. Their actual enclosure covered a very considerable portion of the 57 acres. No actual possession or enclosure on the part of the plaintiff or those under whom she claims reaches any part of the land claimed by the defendants.

It will be observed that the grant of the Powell survey, made to Donaldson, is considerably earlier than that made to Bowen under the Hamilton survey. There is no reference in the Donaldson patent to the Hamilton survey, nor is there any in the Bowen patent to the Powell survey. An older survey than either of these lying east and southeast of the Hamilton survey is the Banks survey, and the Hamilton survey and Bowen grant based upon it call for a corner and two lines of it. The Powell survey seems to have been made without any reference to the Banks survey, since it calls for no line or corner thereof. Another old survey made in 1791, known as the Patterson survey and lying east of the Powell survey, was likewise made without any reference to the Banks survey for, however located, whether as claimed by the plaintiff or defendants, it laps over on to the Banks survey. The southwest corner of the Patterson survey is the beginning point of the Powell survey which follows the western line of the Patterson survey N. 6 W. 194 poles to a Spanish oak, thence leaving the same runs S. 84 W. 184 poles to a Spanish oak and Chestnut oak, thence N. 80 W. 58 poles to four white oaks by a path and S. 80 W. 72 poles to two Lynns and two Sugar trees corner to the Gratton survey at a run and with the Gratton survey S. 14 W. 162 poles to two White oaks and a Spanish oak, corner to the Gratton survey, the Barger survey and the Wolfenberger survey of 464 acres, thence with the Wolfenberger survey S. 65 E. 40 poles to a Hickory and White Oak sapling, thence S. 50 E. 200 poles to a White oak on the line of the Wolfenberger 464 acre tract, corner to another Wolfenberger survey of 51 acres thence with the same N. 20 E. 48 poles to a White oak sapling W. 22 poles to a White oak, N. 20 E. 26 poles to a Chestnut and Chestnut oak S. 80 E. 78 poles to a White oak and Black Oak sapling, corner to the Wolfenberger 51 acre survey and Powell's 400 acre survey, thence with a line of the latter N. 51 E. 120 poles to the place of beginning. The small Wolfenberger survey was made in 1794 and the

larger one was surveyed for John Frogg in 1785. The Powell 400 acre survey was made in 1798.

There is evident conflict between the lines of the Powell 470 acre survey and the lines of the Hamilton 600 acre survey, but no inconsistency of which the court or jury could take notice, as matter of construction, for neither patent recognizes the other. The defendants claiming under the Bowen patent for the Hamilton survey may be within the lines of the Powell survey, consistently with the lines of the Hamilton Survey. As they claim under the title bond from John Stuart for the land described in the deed to him from Clement Carroll, under which Rinehold held possession a long time under which the defendants themselves have been in possession for many years, calling for certain monuments upon the ground, which they say were located by the survey made by Samuel Thompson away back in the 60's, and which survey is inconsistent with the lines of the Powell tract, whether located according to the contention of the plaintiff or the defendants, it may be that this possession is outside of the Bowen grant as well as within the lines of the Donaldson grant.

Presumably on the three-fold view that the title bond is color of title to the extent of the boundaries described in the deed from Carroll to Stuart, that the land in controversy is within the boundary lines of the Bowen patent, and that it lies wholly beyond the lines of the Donaldson patent, there was a general verdict for the defendant accompanied by a special finding that the beginning corner and eastern line of the Donaldson patent are located as claimed by the defendants. The principal complaint is that the court erred in refusing to hold this verdict contrary to the law and the evidence and set it aside. Whether this complaint is well founded involves not only consideration of the evidence, but also the status of the defendants as claimants under the title bond.

In *McNeely* v. *South Penn Oil Co.*, 52 W. Va. 616, it is said that an executory contract of sale of land, stipulating for the future conveyance of the legal title, is color of title under the statute of limitations as to hostile claimants. As it was distinctly held and determined in that case, that there was no adverse possession shown in it as against any of the

parties, the statement is necessarily an *obiter dictum*. Similar expressions have been made by this Court in some other cases, as in *Adams* v. *Alkire*, 20 W. Va. 480, *Swan* v. *Thayer*, 36 W. Va. 46, and *Bennett* v. *Pierce*, 50 W. Va. 604. But, as the paper titles relied upon in all those cases, were deeds and not executory contracts, the question, whether an executory contract is color of title, could not have arisen for decision, and these expressions can be nothing more than dicta. In *Adams* v. *Alkire*, JUDGE SNYDER said: "And it is entirely immaterial whether this color or claim of title be under a good or a bad, a legal or an equitable title. *Shanks* v. *Lancaster*, 5 Grat. 110." I do not think JUDGE SNYDER meant to say that an equitable title is color of title. In his statement, he includes both color and claim, two distinct things. This is followed by the terms legal title and equitable title. I think he meant that the terms legal and equitable should be used distributively, legal referring to color and equitable to claim. *Shanks* v. *Lancaster* could not have been cited for the proposition, that an equitable title may be relied upon as color of title. The syllabus in that case says: "It is immaterial whether possession under a claim of title be under a good or a bad, a legal or an equitable title." In the opinion, Judge Baldwin said, on this phase of the case, "And he and those claiming under him may do this, (go back of the junior patent and show entries and surveys according to his claim,) not only to establish an adversary possession under his junior patent, which confers itself no legal title, but to establish an adversary possession prior to his junior patent, under the entries and surveys upon which the same is founded, it being immaterial whether an adversary possession under the claim of title, be under a good or a bad, legal or equitable title." It is admitted in *McNeely* v. *Oil Co.*, that the proposition is not asserted as matter of decision in any case, unless it be *Adkins* v. *Spurlock*, 46 W. Va. 139. In that case, nothing is said as to whether a title bond is or is not color of title. A title bond was involved in it, but the decision seems to have been based upon another and different proposition of law. Holley, the vendor or maker of the title bond, was a tenant in common with John Lucas. Before the title bond was made, he and Lucas had made a verbal partition, after which Holley executed his

title bond to Spurlock for the part of the land which had been assigned to him in the verbal partition, and put Spurlock in possession of that part, where he had remained for a period of more than ten years.    JUDGE DENT, in his opinion, regarded this as an ouster by Holley, not by Spurlock, or Lucas and those claiming under him, from the occupancy of that portion of the land, which made Holley's, not Spurlock's possession adverse.    The proposition of law asserted as controlling the case was stated in the following terms: "Partition, though it be void, and holding land in severalty by co-tenants, is a mutual ouster of each other of the portion in actual occupancy, and is, therefore, adverse." Clearly, therefore, it was, in the opinion of the Court, not the holding under the title bond that made the possession adverse, but the holding under the partition.    As the status of an occupant of land under a title bond or other executory contract is, for the purposes of defense in an action of ejectment, quite as advantageous as that of a lessee, enabling him to defend not on his title bond, but on the title of the vendor, there is no good reason or necessity for calling the title bond color of title.    It passes no legal title, does not purport to do so, and is, therefore, not within the definition of color of title as given by our decisions.    Hutch. Land Titles, at section 389, says:    " Color of title is that which has the semblance of title, but which in fact is no title, and is any thing in writing, however defective or imperfect, purporting to convey title to the land, and which defines the extent of the claim."    This definition is the one usually given by the courts and law writers.    An essential requisite of it is, that it purports to pass title.    As a court of law takes cognizance of nothing but a legal title, it is difficult to see how a colorable equitable title, such as a title bond or other executory contract, could be treated or regarded in that court as color of title.    Nor does there seem to be any necessity or reason for setting up any such fiction, since one in possession under a claim of an equitable title, may defeat an action for recovery of possession from him under a title hostile to that under which he claims, by showing a better title outstanding in some other person, any person, and if, by the introduction of his title bond, he can show himself to be a claimant of that better title and his possession to be

under it, as such claimant, his case becomes stronger and his right of occupancy clearer. If the outstanding title, thus shown, is good title, a superior title, then the elements of color and adverse possession do not enter into the case. He makes out as against the plaintiff a complete superior title, a perfect paper title, not a title by adverse possession at all. If, on the other hand, he shows a junior patent, or void deed or other paper, purporting to pass a legal title to the person who put him in possession under the title bond or executory contract, or as lessee, and that the possession of himself and his vendor or lessor under that colorable title has been of requisite time and character, his defense is based, not upon his executory contract as color of title, but upon the colorable title of his vendor or lessor, his possession being that of the vendor or lessor, as the case may be, and, under his lessor's or vendor's colorable title, not his own, for he has none. Numerous decisions hold that the possession of a vendee under an executory contract is not adverse, and also that his possession is the possession of his vendor. *State* v. *Harmon*, 57 W. Va. 447; *Core* v. *Faupel*, 24 W. Va. 238; *Clark* v. *McClure*, 10 Grat. 305. At common law, the tenant in possession could always defend under his landlord's title. His failure to do so, however, frequently resulted in hardship and vexation to his landlord. Hence, the Statute, 2 Geo. II, chapter 19 was passed, requiring notice of the action to landlords and giving them the right to make themselves defendants by joining with the tenants in possession, and imposing a penalty upon tenants who refused or neglected to give such notice. Similar statutes have been enacted in most of the states in this country. 7 Enc. Pl. & Pr. 307. Our statute, section 5 of chapter 90 of the Code, says the occupant shall be named in the declaration, and, if a lessee be made defendant without joining his landlord, such landlord may appear and be made a defendant with, or in place of, his lessee. Judge Staples, in *Hanks* v. *Price*, 32 Grat. 107, made a careful, able and exhaustive examination of the authorities for the purpose of determining what the terms lessee and landlord, as used in the statute relating to actions of ejectment, very similar to, if not identical with, ours, mean, and his conclusion is embodied in point 2 of the syllabus in that case, which

says: "In general, the law will imply a tenancy whenever there is an ownership of land on the one hand and an occupation on the other." It is enough that the occupant holds under, and in subordination to, the title of another person, for the purposes of ejectment law. This makes them landlord and tenant. Hence, it seems quite clear that there never can be any necessity for regarding an executory contract as color of title, the occupant under it being the lessee of the vendor and able to defend under his vendor's title, as perfect title, if it be good, and as colorable title, if it be bad. As this is a matter wholly foreign to the subject matter of sections 20, 21 and 22 of chapter 90 of the Code, these sections seem to have no bearing upon the question. They relate to actions and rights between vendor and vendee in the one instance and mortgagor and mortgagee in the other. The doctrine propounded here obtains between persons not in privity with one another in any sense, nor holding under the same title, but on the contrary, under strange and hostile titles. There is some authority as shown in *McNeely* v. *Oil Co.*, cited, for the position that a title bond is color of title, but these authorities do not refer their conclusions to any general principle of law, nor show any necessity for such deviation from settled legal principles. Some of them hold that a title bond constitutes color of title if the purchase money has been wholly paid, so that nothing remains to be done except the delivery of a deed. Others hold that it constitutes color of title whether the purchase money be wholly paid or not. It is difficult to see how the payment or non-payment of the purchase money could make any difference, inasmuch as the holding must proceed upon the theory that the sole object of color of title is to define boundaries and that it need not purport to pass any legal title.

It is apparent that in a practical sense, the same result is generally accomplished by allowing the vendee to defend under the colorable title of his vendor that would come from allowing the use of the title bond as color of title. For the purposes of this case, it suffices to say the defense is made under the Carroll-Stuart deed as color, and not under the title bond, and we find it unnecessary to decide whether, in case there were no paper muniment other than the bond,

it would be admissible as color of title. A claim of title could undoubtedly be predicated upon it, but that differs widely from color of title.

John Stuart was never the owner of any part of the Henning tract, although the deed to him seems to describe it as his land. It was granted to William Donaldson, who conveyed it to Samuel Donaldson, who conveyed it to Nathan Henning, who conveyed it to Charles A. Stuart, the father of John Stuart. Charles A. Stuart devised it to his wife, Elizabeth Stuart, who devised it to Henry Stuart and Thomas Bradford in trust for her son, Robinson Stuart's wife and his family. Robinson Stuart and his children made deeds for it to Edmond Sehon, and Thomas H. Dennis, as commissioner of the circuit court of Greenbrier county, conveyed to Sehon the interest of Charles A. Stuart, Jr., a son of Robinson Stuart. Edmond Sehon and his wife, daughter of Robinson Stuart, conveyed the land to Cornelia Lewis. John Stuart purchased the 57 acres, the location of which is in controversy here, from Clement Carroll, believing it to be a part of the Bowen grant and accepting it as such. Hence, as to the Henning tract, the plaintiff is not in privity with John Stuart or the defendants holding under him. The Bowen patent, being later in date than the Donaldson patent, is only color of title as against the latter, and the deed to John Stuart from Clement Carroll is mere color of title as against it. The grave questions presented, then, are whether the Bowen patent and the deed made to Stuart, or either of them, interlocks with the Donaldson patent, and so covers part of the land granted to Donaldson and now claimed by the plaintiff; whether the possession of the defendants, which has been open, notorious and continuous for a long period of time, within the boundaries of the Donaldson grant as claimed by the plaintiff, was within or outside of the boundaries of the Bowen patent, and, though outside of the boundaries of that patent yet within the boundaries of the deed made from Carroll to Stuart, and whether the Donaldson patent covers the land in controversy, it being the contention of the defendants that it does not touch any portion of it.

That the verdict of the jury as to the location of the Donaldson grant of the Henning land, is contrary to the law

and the evidence, seems clear beyond question. All the witnesses say, that, if located according to the contention of the defendants, it will run over into what is called the Frogg survey of 464 acres, known also as the large Wolfenberger survey, and completely cover the small Wolfenberger tract of 51 acres. The location of the Wolfenberger tracts seem to be agreed upon by the witnesses. There is no controversy as to their location. Some of their lines, corners, courses and distances are called for as lines, corners, courses and distances of the Henning tract. These two tracts, therefore, are monuments called for in the description of the Donaldson grant. Beyond them the Donaldson grant cannot extend without ignoring the monuments called for therein. To locate it beyond them is not only to disregard the evidence, but likewise to disregard the law. Marked lines and reputed boundaries of adjoining tracts, called for in the deed or patent, and the locations of which are not disputed, must be observed by both court and jury. Other lines and corners, as to the location whereof the evidence is uncertain, must be located from them. Monuments and lines identified or admitted must prevail and govern in finding those not identified. *Summerfield* v. *White*, 54 W. Va. 311; *Ruffner* v. *Hill*, 31 W. Va. 428. The only reply made by counsel for the defendants to this circumstance is that the Donaldson grant, if located according to the claim of the plaintiff, will extend over into the Banks survey, and push the Patterson survey almost wholly over into the Banks survey, and fail to connect as it should with the Gratton survey. The contention of the defendants themselves would locate part of the Patterson survey within the Banks survey. This is no answer to the proposition. Neither the Donaldson patent nor the Patterson survey calls for the Banks survey or any line of it as a monument. They wholly ignore that survey. They are hostile grants, covering in part the same land. Hence, it is no objection that the one laps upon the other. For no other reason than that otherwise the Donaldson grant would lap on the Banks tract, defendants would shorten the lines and reduce the quantity of the former, a quarter, third or half, and carry the lines and corners to distances and places to which they cannot go without direct contradiction of the patent and survey. Such results cannot

stand on mere conflict with the Banks survey. In locating the Donaldson grant according to the claim of the plaintiff, there is some confusion with the Gratton survey for which it calls as a monument, and it fails to reach the Jacob Barger survey, for the corner of which it calls as a monument. The conflict between it and the Gratton survey may be due to some error as to the location of the corner and line of the latter, but it reaches that survey, goes to it and over on to it. It does not reach the Jacob Barger survey, as it should, but no evidence in the case will solve these difficulties. It is an irreconcilable conflict. The Donaldson grant as located by the defendant would not touch either the Gratton survey or the Barger survey. Hence, their evidence wholly fails to reconcile it. On the contrary, it would make the situation worse. To give the Gratton and Barger survey calls control and restrain the Donaldson calls so as to correspond would still leave a large portion of the land in controversy within the plaintiff's boundary.

It seems clear also that the evidence is insufficient to establish the location of the land in controversy wholly within the Bowen grant of the Hamilton survey. It tends strongly to show that a certain corner of the Jacob Barger survey is a corner of the Hamilton survey. There seems to be no controversy on that point, and this corner seems to be consistent with the long northern and western irregular line of the Hamilton survey, which is described as running with Moody's line to Murphy's corner and to Black's line and with it to a corner of David McCoy and on to Mushbarger's line and with it down to that corner, passing, away back on the line, a cave called for in the description, which the evidence locates and identifies. Neither is there any controversy about the location of another corner at the extreme eastern end of the Hamilton survey, near which this long northern and western zigzag line begins. The beginning point of the patent is almost directly between these corners, and is described therein as two sugar trees, a hickory and lynn, corner to the Banks survey, and running, thence, with the same N. 60 E. 400 poles to a hickory and white oak on a ridge, another corner of the Banks survey. This is the eastern corner just mentioned herein and the location of which

is practically uncontroverted. The Banks patent seems not to have been given in evidence, but one of the surveyors says that patent describes the corner of the Banks land, which is made the beginning corner of the Hamilton survey, as two lynns and a sugar tree on the northwest side of a branch, and he testifies that, while the timber is not found at the point at which the plaintiff says that corner is located, he did find a small sugar tree there, standing just north of a branch. A line run from the corner at the eastern end of the tract, the location of which is practically undisputed, back to the place at which the plaintiff locates the beginning corner, on the bearing called for in the survey and patent, reversing the call and allowing for variation, would locate the corner in accordance with the plaintiff's claim. No monument is identified by the evidence of either plaintiff or defendants. The evidence is uncertain, remote and slight. No witness testified that he had ever seen any tree either at the place claimed by the defendants or the plaintiff as the beginning corner of the Hamilton survey, which he knew to be the corner, or which was the reputed monument. The defendants would locate this corner seventy-odd poles southeast of the corner contended for by the plaintiff on, or nearly on, a line of the Banks survey, running northwest and southeast. A tree was found there which was blocked and the ax-mark was very old, but it does not appear to have been marked as a corner tree. It may have been marked merely as a line tree. Besides the mark does not agree in age with the call. Going to the western end of the tract and running from the corner there which seems to be practically undisputed, the calls of the deed for course and distance would locate the line substantially in accordance with the contention of the plaintiff, except as to the length of the closing line, which would be seventy-odd poles long instead of 130 on the Banks line. From that western corner two calls of the Bowen patent carry the line to the Banks line. One of these is S. 80 E. 210 poles and the other N. 40 E. 130 poles. The last call is from this point with the Banks line to the place of beginning, the Banks corner, the distance being 130 poles. The defendants' contention would bring these two calls to the Banks line at about two hundred poles from the point contended for by

the plaintiff as the beginning corner, and about 130 poles from the point contended for by themselves as the beginning corner. To sustain the contention of the defendants it would be necessary to ignore the corner at the western end of the tract which has been mentioned or else disregard course and distance, in the absence of identification of any monuments to justify disregard thereof. Identified monuments will control course and distance, but, in the absence of such monuments, course and distance must be observed. The one proposition is the converse of the other. When marks upon the ground are ascertained and identified, they are more certain and reliable than a description on paper, and when they are not ascertained the paper description of them is the best means of finding them, if there is a beginning point reasonably well established from which to start and follow the course and distances. "The true principle is that the course and distance called for in the grant must govern in respect of each line except so far as they may be controlled by calls for natural objects or artificial monuments proven to have been made or adopted for the survey itself, and in fixing those of any one line no reference can legitimately be had to the variation from the patent calls that may be found necessary in determining the course and distance of any other line according to natural or other controlling objects found upon the ground." Judge Lee in *Clements* v. *Kyles*, 13 Grat. 468, 481. See also *Smith* v. *Chapman*, 10 Grat. 445. Another weighty circumstance is, that the quantity of land in the Bowen grant would be very much greater, if the contention of the defendants should prevail, than that called for in the grant. The grant calls for 600 acres, but it would include about 800, if the disputed lines were located as claimed by the defendants, and a little over 600 if located as claimed by the plaintiff. Though description by quantity is the most uncertain method, usually adopted, it is to be considered, and, in this instance it is in accord with the great preponderance of evidence as to the location of the lines. Under such circumstances it is not without weight. *Western M. & Mfg. Co.* v. *Coal Co.*, 8 W. Va. 406.

It remains to determine whether or not a good defence has been made, by possession, under the deed from Clement

Carroll to John Stuart as color of title.    It will be remembered that Carroll, in conveying his land to John Yates, excepted what he called a fifty acre tract and described it as land sold to " Charles A. Stuart *decst*.," and then conveyed that land to John Stuart, as a 57 acre tract.    John Stuart was a son of Charles A. Stuart, but he never owned the Henning place.    The reference to the Henning place in the deed from Carroll to him may be due to the fact that the sale had been originally made to Charles A. Stuart, the father, who did, at the time of the sale, own the Henning place.    However, both the general description and the particular description, by metes and bounds, in that deed say the land adjoins the Henning place.    The beginning point is described as a corner to the Henning place and the line, after going around, comes back to another corner of the Henning place, and runs thence to the place of beginning.    There is inconsistency, however, in this, that the closing line does not correspond in course and length with any northern line of the Henning tract.    But if the corners called for could be ascertained and identified, as corners of the Henning tract, they would prevail over the calls for course and distance and the land, according to the description contained in the deed, would lie wholly outside of the Henning tract, provided the Henning tract referred to in the deed is not some other Henning tract, then owned by John Stuart.    *Casto* v. *Baker*, 59 W. Va. 683; *Gwynn* v. *Schwartz*, 32 W. Va. 487, 496; *Adams* v. *Alkire*, 20 W. Va. 486; *Pasley* v. *English*, 5 Grat. 151; *Smith* v. *Davis*, 4 Grat. 50; *Coles* v. *Wooding*, 2 Pat. & H. 196; *Shaw* v. *Clements*, 1 Call. 429; *Dogan* v. *Seekright*, 4 H. & M. 125. Whether he was the owner of any other Henning tract that might answer this description is not disclosed by the evidence.    However, owing to the state of the evidence, another well settled proposition justified the submission to the jury of the inquiry, whether the lines or monuments, called for in the deed are not partly within the bounds of the Donaldson grant, known as a Henning tract, even though it be the Henning tract, referred to in the deed as an adjoining tract.    Soon after the date of the deed, May, 1852, Rinehold, as vendee of John Stuart, entered upon the land in question and he and those holding under the Stuart deed have ever since held the possession thereof.    Buildings

have been erected, lands cleared and fenced and cultivated, down to and a little beyond the southern line as claimed by the defendants. Not long after Rinehold took possession Samuel Thompson, and presumably at the instance of Rinehold and Stuart, made a survey of the land, observing the corners and lines called for by the deed, and marking the trees, which he supposed were called for in the description. John A. Yates says he was present when this survey was made and the surveyors who testified in this case spoke of the survey as a fact well known to them. That survey, these surveyors say, locates the land in accordance with the present claim and holding of the defendants. The monuments are not well identified and there is much uncertainty as to their exact location, but there is some evidence tending to show the location of the lines as made by Thompson. Rinehold and Yates, his successors, have held the possession of this land more than forty years with the knowledge of Robinson Stuart, and the later owners of the Henning tract. It is a significant circumstance, that close relatives, mother and son, at first, and uncle and neices and nephews later, held these conflicting claims of title, and this may account for the lack of contention or dispute of the right of possession and exact location of the 57 acre tract of land. That the defendants and their predecessors in title claimed the land in controversy under the Carroll-Stuart deed was known to the holders of the hostile Donaldson title and that no objection was raised at any time, until shortly before the institution of this action, are facts concerning which the evidence is clear and practically uncontradicted. There is some testimony tending to show that Yates was regarded by Sehon as a tenant of his as to the Henning tract, but this is contradicted by the positive evidence for the defendants, wherefore it was a question for the jury. These facts and circumstances bring the case within the principles asserted in *Gwynn* v. *Schwartz*, 32 W. Va. 487, holding as follows: "Disputed boundaries between two adjoining lands may be settled by express oral agreement, executed immediately and accompanied by possession according thereto. Long acquiescence by one adjoining proprietor in a boundary established by the other is evidence of such agreement so fixing the division-line between them." *Baker* v.

*Seekright*, 1 H. & M. 178, often cited with approval in later cases, allows the admission of parol evidence to prove marked trees, not in the course or termination of a line, to be the true line intended. *Dogan* v. *Seekright*, 4 H. & M. 125, follows this case, reversing a judgment of the court below on account of an instruction to the jury, telling them they must find a line corresponding exactly with the description given in the deed, notwithstanding the presence of evidence tending to show a different line which had been marked and recognized by the parties. *Norcom* v. *Leary*, 3 Ired. 49, cited with approval by this Court in *Teass* v. *St. Albans.* 38 W. Va. 1, holds that: "In all cases the effect of long and notorious possession, as affording presumptive evidence of right, is very powerful. In questions of boundary, it is at least tantamount to a general reputation." The judge in delivering the opinion in that case made the following additional observation: "It shows a claim distinctly asserted by the possessor, and acquiesced in by those most interested to repel it if unfounded, and most likely to ascertain whether it be or be not well founded. *Owen* v. *Bartholomew*, 9 Pick. 520, also approved in *Teass* v. *St. Albans*, enunciates the same doctrine, holding as follows: "In the case of a grant of land by the commonwealth, in which the land is described by courses and distances, with reference to monuments, evidence of long continued occupation under it is admissible to prove the boundaries, and though the given distances are exceeded, they may be controlled by the boundaries so proved." *Coles* v. *Wooding*, 2 Pat. & H. 189, holds as follows: "Where deeds of partition between co-parceners recited that a boundary line between them had been 'run, made and established,' and the parties had continued in possession up to the line so run and established, from the date of the deeds, for twenty years, less two days,— when a writ of right was instituted between parties claiming under them, seeking to set up the boundary described in the deeds, which was different from lines actually run by the parties—it was *held*: That after such long acquiescence by one party, and quiet possession by the other, that possession ought not to be disturbed." In *Dogan* v. *Seekright*, 4 H. & M. 125, Judge Tucker said:

"If lines and corners be proved to have been actually run, and agreed on as a boundary between parties holding adjacent lands, those lines and corners are from thenceforth to be regarded as the limits of the possession of each; and from the period of running such lines, if they continue to be acquiesced in, the acts of limitation may be considered as beginning to run, so as to control the courses and distances mentioned in the deed, by establishing an adversary possession in either party, according to the lines so run." While the cases in which this principle has been applied vary in their circumstances, so that in some instances the agreed line was clearly identified by the evidence, in others the parties held up to the line on both sides, in others only one party held up to the line, and in others the line was not established or identified beyond all question by the evidence, the evidence in this case to which reference has been made seems to make it one proper for the determination of the jury as to whether the Thompson survey, corresponding with the calls of the deed as to course and distance, and slightly supported by evidence of marked trees, defines the lines according to which the defendants have held possession, and cleared and cultivated lands, and whether the plaintiff's predecessors in title have known and acquiesced in the boundary line.

This conclusion, however, brings the defendants face to face with an insuperable difficulty. The greater portion of the land to which they would thus show themselves entitled, if not all of it, lies outside of the Bowen grant. Clement Carroll had caused to be entered upon the land books for taxation land included in the Bowen grant. He owned no land south of that. When he conveyed his lands to John Yates, excepting therefrom the supposed 57 acres, Yates caused himself to be charged with 300 acres, the quantity mentioned in the deed. John Stuart never caused his deed to be recorded and the land called for in it never was entered on the land books for taxation in his name, in Rinehold's name or in Yate's name and no taxes have ever been paid on it under that title. John Stuart never owned or claimed any interest in the land under the hostile Donaldson grant or title. He held a colorable, strange and hostile title, under which the land was never taxed. It therefore

38

became forfeited to the state for a period of five years of non-entry for taxation and non-payment of taxes, Cons. Art. XIII, section 6, *Parkersburg &c. Co.* v. *Schultz*, 43 W. Va. 470, and has never been redeemed. By virtue of section 3 of Article XIII of the Constitution, this forfeited title has been transferred to the plaintiff and those under whom she holds. The non-payment of taxes was in no sense her fault. As she did not claim under that title it was in no sense her duty to pay them. She had been in possession by her tenant under her own title covering the same land and paid the taxes on it under her title. Therefore, she was in a position to take by transfer the forfeited hostile title. Payment of taxes on the land by her and her predecessors in title under her own title, did not prevent the forfeiture of the hostile title under which she was neither bound to pay the taxes nor possibly had any right to pay them. In view of this situation, the verdict cannot stand, although for the reason stated it would otherwise be beyond the power of the court to disturb it, unless the statute of limitations saves it. Before the passage of section 20 of chapter 35 of the Code, saying "Every statute of limitation, unless otherwise provided, shall apply to the state," there was no adverse possession against the state. In *Smith* v. *Chapman*, 10 Grat. 445, Judge Lee said: "But if the party in possession had acquired no such rights at the time of the forfeiture, (title by transfer or title by adverse possession against the forfeited title,) from that time his adversary possession and the statute of limitations must cease to run as against the commonwealth, and the commissioner's deed would pass her title thus acquired unaffected by the continued possession of the party holding with whatever claim of title;" and the Court held that: "An actual possession of land claiming the same adversely does not prevent the operation of the deed made by the commissioner of delinquent lands, conveying to a purchaser the commonwealth's right to the land." See also *Staats* v. *Board*, 10 Grat. 400; *Levasser* v. *Washburn*, 11 Grat. 572. *State* v. *Harman*, 57 W. Va. 447, 448, 469, holds that the statute of limitation runs against the state as to land, the title whereto, is in the state by forfeiture; and such operation of the statute was suggested in *Foley* v. *County Court*, 54 W. Va. 16. As

the latter case did not concern such lands, there was, in it, no application of the doctrine; but, in *State* v. *Harman*, it was applied, although we decided that the party to whom we gave the benefit of it had title to the land by transfer, under section 3 of Article XIII of the Constitution. There the benefit of it was allowed to one who was not in default, as to payment of taxes on land, and whose title was good independently of his adverse possession. Here we have the reverse of that condition. The person whose title has been forfeited remains in actual possession. If the statute is allowed to operate in his favor against the state, the constitutional machinery, designed for the enforcement of the state's right to taxes on all land, and the settlement of land titles, by forfeiture and transfer under sections 6 and 3 of Article XIII of the Constitution, respectively, will cease to perform its functions in cases of this kind. A legislative act cannot have such effect. Whatever its terms may be, it must be subordinated to the organic, paramount law of the state and made to operate in harmony with it. The legislature has power to release and dispose of forfeited land titles, *State* v. *Jackson*, 56 W. Va. 558, but it certainly cannot, directly, or indirectly, nullify the forfeiture and transfer clauses of the Constitution. It cannot prevent forfeitures and transfers, which the Constitution says shall occur so as to make the land yield to the state her taxes, and as to vest superior title in persons who have put themselves within certain conditions prescribed by said section 3. The statute applied in *State* v. *Jackson*, and treated as a legislative grant of forfeited titles, did not conflict with any constitutional provision. It neither prevented forfeiture under section 6 nor transfer under section 3. It seems to me the state does not take for proprietary speculative purposes, but only for governmental purposes, chiefly for the settlement of land titles. The following, taken from Judge Lee's opinion in *Smith* v. *Chapman*, 10 Grat, 445, 464, might at first seem to conflict with the conclusion here stated: "If at the time of the forfeiture or afterwards, the forfeiture is declared by law to enure to the benefit of the party in possession, a deed subsequently made by the commissioners would of course pass nothing to the purchaser. And so if at the time of the forfeiture, the claimants of the

title so forfeited had been barred of their right to recover by the long continued adversary possession of the party holding, under the statute of limitations, the commonwealth would only take the title in the same plight and condition in which the claimants held it, and the commissioner's deed would be inoperative to convey to the purchaser any other or better right to recover. But if the party in possession had acquired no such rights at the time of the forfeiture, from that time his adversary possession and the statute of limitations must cease to run as against the commonwealth, and the commissioner's deed would pass her title thus acquired unaffected by the continued possession of the party holding with whatever claim of title." But it does not, for the reason that it assumes that the title, acquired by adverse possession, has not been forfeited. We have here exactly the reverse of the supposed cases stated by him. The title acquired by adverse possession is itself forfeited and the better paper title not forfeited. Title by adverse possession is forfeitable for non-entry for taxation. *Parkersburg &c. Co.* v. *Schultz*, 43 W. Va. 470. If the forfeited and transferred title could have been won back from the plaintiff and her predecessors in title by continued possession of the defendants after the forfeiture and transfer, it was repeatedly reforfeited and re-transferred, so that it is an utter impossibility that they could now have any title. This conclusion is predicated, however, upon the case as it now stands. In another trial, a different state of the evidence may appear, justifying the location of this land outside of the plaintiff's boundaries or within the Hamilton survey.

The action of the court in admitting the testimony of witnesses to the effect that John Stuart had delivered to Rinehold the title bond, admitting the payment of all the purchase money, and the assignment of the title bond by Rinehold to the father of the defendant, W. C. Yates, principally upon the ground that John Stuart should have been called to testify himself, to the execution and delivery of the title bond, he being still alive, and, in the other instance on the ground that the assignment should have been in writing and produced in evidence. Neither of these objections is tenable. It was competent to prove by any third person the act and declaration of

John Stuart as well as by himself.- The admission of the testimony as to the assignment of the title bond was justified by evidence to the effect that it had been lost after the assignment and could not be produced. These objections are no doubt based upon the theory that the title bond itself is color of title with which the defendants were bound to connect themselves by means of written muniments of title. What has been said on this subject suffices to sustain the admission of the evidence as showing that the defendants were rightly in the occupation of the land as equitable claimants under the deed from Carroll to Stuart.

For the reasons stated, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed. Remanded.*

(NOTE BY BRANNON, JUDGE.)

I still adhere to the opinion in *McNeely* v. *South Penn Co.*, 52 W. Va. 616, that an executory written contract giving boundary is, in and of itself, as color of title, just as good as a deed purporting to convey legal title. It is not the paper that counts under the statute, it is the possession with intent to claim that does the work under the statute. Title is not the question. What difference is it when a man is in actual possession claiming the land, whether he claims it under a deed purporting to pass legal title or under an executory contract? Neither the deed nor the contract is used to show title, but simply to mark the boundary of the the possession and claim. It is the possession and claim that accomplish the defeat of the adverse claim, and the paper, whether a deed or contract, is used only to show claim and prescribe boundary and limit the extent of the claim and possession. Why is not a contract *color* for these purposes? It seems very technical to say that it is not. To hold it such does not antagonize any of our own decisions. Take the case where there is no legal title shown in the party making a title bond or executory contract, where he has no title. Would you say that the party holding under the title bond for the period fixed by the statute could not defend the possession? In such case he could not fall back on the title of his vendor, and yet no length of

time would give him title under the statute, under the theory that it is not color. In addition to the cases cited on this subject by me in *McNeely* v. *Oil Co.*, cited above, I now cite *Mullen* v. *Carper*, 37 W. Va. 215, holding that, "Any written instrument, however defective or imperfect, and no matter for what cause invalid, purporting to *sell*, transfer, or convey title to land, which shows the nature and extent of the party's claim, constitutes 'color of title,' within the meaning of the law of adverse possession." See many cases cited in 1 Encyclopedic Digest, 206-7. In *Creekmur* v. *Creekmur*, 75 Va. p. 438, the opinion says, "It is impossible to say with any degree of accuracy what is color of title. Upon this subject there is hopeless confusion, as well as irreconcilable diversity of opinion. Color of title has sometimes been held to be that which in appearance is title without being in reality so. Again, it has been held that it matters not how defective the title may be, whether the occupant makes color under a written or a parol contract, or even under no contract at all. Tyler on Eject. 863-4; *McCall* v. *Neely*, 3 Watts R. 69, 72. Without attempting now to describe 'color of title,' it may be perhaps sufficient to say its effect is to fix the character of the occupant's possession, and to define its extent and limits. As a general rule, the possession of one who has a colorable title is co-extensive with the boundaries of his deed, or other instrument under which he claims, in the absence of any actual possession by the true owner. Whereas the possession of one entering and holding under a mere claim of title is necessarily confined to the land in actual occupation." *Sharp* v. *Shanandoah Co.*, 100 Va. 27, says that any instrument conferring appearance of a semblance of title, legal or equitable, is color of title. In *Chesterman* v. *Bolling*, 102 Va. 471, the court treated an executory contract as color of title. Why shall we now cast shadow over so many cases holding what ought to be the law? I grant, of course, that where one having legal title sells by executory contract land to another the vendee can defend his possession by attributing it to his vendor, saying that his possession is as that of a tenant under his grantor or lessor; but where there is no such grantor shown, where the occupant shows an executory contract only, I hold that he can use it, without reference to any one holding the legal

title for him, on the strength merely of his written contract, purporting to bargain and sell.

In addition I would say that one who has an executory contract selling land to him, not providing for a future deed, if it be under seal, has legal title upon the theory that his sealed contract, showing bargain and sale for valuable consideration, in a deed of bargain and sale, operative under the statute of uses passing legal title. Code 1899, chapter 71, section 14. A deed of bargain and sale is, "a real contract whereby a person bargains and sells his land to another for a pecuniary consideration, in consequence of which a use arises to the bargainee, and the statute of uses immediately transfers the legal estate and actual possession to the *cestui que use*, without any entry or other act on his part; a kind of a real contract, whereby the bargainer, for some pecuniary consideration, bargains, and sells, that is, contracts to convey the land to the bargainee, and then the statute of uses complete the purchase." 5 Cyc. 616. Many authorities say this. Nobody would dispute that a regular deed of bargain and sale, so long used in Virginia before the short form of deed given in the Code was adopted, and perfectly valid yet, would be color of title.